Roderick Leshun RANKIN *v.* STATE of Arkansas

CR 96-1025                                          948 S.W.2d 397

Supreme Court of Arkansas
Opinion delivered July 14, 1997
[Petition for rehearing denied September 11, 1997.]

*Cross, Kearney & McKissic,* by: *Gene E. McKissic,* for appellant.

*Winston Bryant,* Att'y Gen., by: *Brad Newman,* Asst. Att'y Gen., for appellee.

DAVID NEWBERN, Justice. Roderick Leshun Rankin, the appellant, was sentenced to death for the capital murders of Zena Reynolds, her mother Ernestine Halford, and her stepfather Nathaniel Halford. Mr. Rankin raises six points on appeal. Most of Mr. Rankin's assignments of error are either meritless or procedurally barred from review. Mr. Rankin's argument concerning the admission of his incriminating custodial statements is, however, well taken. Mr. Rankin asserts that the Trial Court admitted his statements into evidence without first holding a hearing on his motion to suppress. As the record fails to reflect whether a hearing was held on the motion or whether a ruling was made, we reverse and remand. On remand, the Trial Court shall conduct a hearing *on the record* for the limited purpose of determining whether Mr. Rankin's statements were made after knowingly and intelligently waiving his right against self-incrimination.

At trial, the State introduced the testimony of Sonyae Reynolds, who was the sister of victim Zena Reynolds and the daughter of victim Ernestine Halford. Ms. Reynolds testified that she hid in a closet in the victims' home during the attack. She said that she believed the assailant was Mr. Rankin because she saw the assailant wearing clothes that she knew to be similar to Mr. Rankin's clothes. Ms. Reynolds admitted that she did not see the assailant's face and that she had previously told the police that the assailant was *not* Mr. Rankin because she thought the assailant had shorter legs than Mr. Rankin. The type of clothing described by Ms. Reynolds was later discovered at Mr. Rankin's home and admitted into evidence.

Ms. Reynolds's testimony established a motive for the murder. According to her testimony, Mr. Rankin had repeatedly threatened to kill Ms. Reynolds and her family if she left him. The testimony showed that Mr. Rankin and Ms. Reynolds were having "relationship problems" and that Mr. Rankin was often jealous of Ms. Reynolds's other male friends and had hit her on other occasions.

Sharon Carter, who lived next to the victims' home, testified that she saw someone fleeing after hearing the door being kicked open and then gunshots. She said that the person fleeing was tall. Her description of the clothes worn by this person was generally consistent with the description given by Ms. Reynolds and consistent with the type of clothes discovered at Mr. Rankin's home.

The scientific evidence established that a pistol found near the victims' home was used in the murder. That pistol, along with a VCR and some CDs, had been stolen from the home of Ernest R. Demmings, a local fireman. The evidence showed that the VCR and CDs were found at Mr. Rankin's home. The VCR in fact appeared to be hidden under dirty clothes. Although the evidence did not show that the pistol was ever seen at Mr. Rankin's home, the State argued that Mr. Rankin had come into possession of the murder weapon when he came into possession of the VCR and CDs.

Detective James Cooper of the Pine Bluff Police Department testified that he had been interrogating Mr. Rankin on the day of his arrest when he was told the murder weapon had been discovered. Detective Cooper testified that he relayed that information to Mr. Rankin. Another officer showed the pistol to Mr. Rankin, who responded, "You don't have to show me that because I'm going to talk to you." The police then began to record the interrogation. The jury received transcripts of the interrogation and heard the tape played in court.

In the interrogation, the police officers asked Mr. Rankin if he had kicked in the door to the victims' house and shot the victims. They asked Mr. Rankin if he had experienced problems with Sonyae Reynolds; whether such problems led him to commit the murders; whether he was wearing blue shoes on the morning

of the murders; and whether he had seen blood on the shoes. They asked him whether the .gun that they had shown him was the murder weapon and whether he had placed it at the location where it was discovered. Mr. Rankin's response to each of these questions was a simple "Yes, sir."

The police also asked Mr. Rankin who he saw first when he entered the house. He answered that he first saw Zena Reynolds and her children on the couch. The officers asked Mr. Rankin what happened next, and he answered, "I don't know. It just— then everybody start running out and I—I guess I got scared." The officers asked him if he then started shooting, and he answered "Yes, sir." Mr. Rankin told the police that he shot Zena Reynolds, then Mrs. Halford, then Mr. Halford. He told the officers that he knew Sonyae Reynolds was also in the house but that he got scared and left. At the conclusion of the first interrogation, Mr. Rankin stated that "this is not what I meant to happen and I'm sorry, but I know that won't bring them back." In the second interrogation that occurred on the afternoon of Mr. Rankin's arrest, the police asked Mr. Rankin how he arrived at the victims' home. He answered, "I walked." Thereafter, Mr. Rankin reached for the tape recorder, turned it off, and indicated that he no longer wished to talk with the police.

### 1. Sufficiency of the evidence

■ Mr. Rankin argues that the evidence was insufficient to support his capital-murder convictions and that the Trial Court therefore erred in denying his motion for directed verdict. We must address this point before considering other assignments of trial error in order to preserve Mr. Rankin's right to freedom from double jeopardy. *Bradford v. State,* 325 Ark. 278, 283, 927 S.W.2d 329, 331 (1996). We conclude that Mr. Rankin has failed to preserve the question of the sufficiency of the evidence for review and thus affirm on this point without reaching the merits.

■■ Arkansas Rule of Criminal Procedure 33.1 requires a defendant to renew his motion for directed verdict at the "close of the case" in order to preserve for review any question pertaining to the sufficiency of the evidence to support the jury verdict.

Even if a defendant renews his motion at the close of his case-in-chief, the requirement of the rule to renew the motion at the "close of the case" obligates the defendant to renew the motion again at the close of any rebuttal case that the State may present in order to preserve the sufficiency issue for appeal. *Heard v. State,* 322 Ark. 553, 557, 910 S.W.2d 663, 665 (1995); *Christian v. State,* 318 Ark. 813, 816, 889 S.W.2d 717, 719 (1994). The renewal of the motion for directed verdict must occur before the jury is charged. *Webb v. State,* 326 Ark. 878, 879, 935 S.W.2d 250, 251 (1996). An "attempt to renew a motion for directed verdict *after* the jury has been charged is not timely and is not in compliance with the rule." *Claiborne v. State,* 319 Ark. 602, 603, 892 S.W.2d 511, 512 (1995). *See Marshall v. State,* 316 Ark. 753, 875 S.W.2d 814 (1994); *Thomas v. State,* 315 Ark. 504, 868 S.W.2d 483 (1994).

Counsel for Mr. Rankin moved for a directed verdict at the close of the State's case and renewed the motion at the close of Mr. Rankin's case-in-chief. The motions were denied. The State then presented its rebuttal case. The State rested, and defense counsel indicated that he had no "surrebuttal." The judge told the jury that the evidence-taking portion of the trial had concluded, and he read the jury instructions. The State made its closing arguments, and defense counsel made his closing arguments. After a recess, the State presented a rebuttal argument.

Defense counsel did not attempt to renew the motion for directed verdict until after the State had completed its rebuttal argument. By that time, the jury had been charged, and closing arguments had been concluded. The attempt to renew the motion therefore was not timely. Because the motion was made after the jury had been charged, the motion was not renewed "at the close of the case," and thus the sufficiency argument was not preserved for review..

### 2. Mistrial

Mr. Rankin also argues that his conviction should be reversed because two of the State's witnesses, apparently in violation of an order of the Trial Court granting a motion *in limine,*

testified that blood or possible blood stains were found on Mr. Rankin's tennis shoe. Mr. Rankin contends that this testimony was prejudicial and required the Trial Court to order a mistrial. Prior to trial, Mr. Rankin moved *in limine* to exclude any laboratory reports or testimony showing that human blood had been found on Mr. Rankin's tennis shoe and blue jeans. The motion stated that the Arkansas State Crime Laboratory was unable to determine whether blood found on these items was related to the murders. The record does not contain a ruling from the Trial Court on Mr. Rankin's motion *in limine*.

During the State's case-in-chief, Cathy Ruhl, a forensic crime-scene technician with the Pine Bluff Police Department, testified that she received a pair of navy blue Reeboks and a pair of black-top tennis shoes that the police had taken from Mr. Rankin's home during a consensual search. Ms. Ruhl identified the Reeboks in court and testified without objection that they "were sent to the State Crime Lab to have serology done on them" because one of the shoes contained "possible blood stains." Ms. Ruhl testified without objection that the black-top tennis shoes were not sent to the Lab because "[t]here were no visible signs of stains on the shoes."

Detective Daniel Dykes of the Pine Bluff Police Department later testified that he participated in a consensual search of Mr. Rankin's home along with other officers on the morning of the murders. Detective Dykes stated that the police located one pair of tennis shoes by the couch on which Mr. Rankin had been sleeping and a second pair underneath the couch. Detective Dykes testified that "the tennis shoes had just a little bit of blood on them. Where I saw the blood was on the soles of the tennis shoes."

Defense counsel then objected to Detective Dykes's statement that he observed blood on the shoe and expressed his belief that the Trial Court had granted the motion *in limine* and "had instructed everyone to admonish their witnesses not to make any reference" to suspected blood stains found on Mr. Rankin's shoes. The judge indicated that defense counsel's characterization of his ruling was "correct." The judge recalled that, due to the incon-

clusive evidence linking any blood to Mr. Rankin or to the victims, he had ordered the State not to ask questions about blood stains found on Mr. Rankin's shoes and to admonish its witnesses "not to bring it up." The judge indicated that the testimony of Ms. Ruhl and Detective Dykes violated his order.

During an in-chambers conference concerning the objection, counsel for Mr. Rankin mentioned the need for either a strong admonition to the jury to disregard the references to blood on the clothing or a mistrial. During the discussion of those possibilities, the Trial Court twice asked counsel what he was being asked to do. No motion for a mistrial was offered by counsel whose final word on the subject was the following:

> Well, I'll put it in my words, your Honor. I would ask the Court to go out and admonish the jury to disregard the testimony regarding any existence of blood on Mr. Rankin's shoes and then further admonish the jury that, in fact, it is the understanding of the Court from the parties that there is no credible evidence of blood relating Mr. Rankin to the scene of this crime.

The judge and counsel agreed that a cautionary instruction would be necessary in light of the testimony given by Ms. Ruhl and Detective Dykes. At the conclusion of Mr. Rankin's case-in-chief, the judge indicated to counsel that he would give the instruction, and counsel responded, "That's all we want." Prior to the State's rebuttal case, the judge gave the following instruction:

> Ladies and gentlemen, before we go any further, I have been asked by the attorneys that—to tell you that in response to some testimony that actually inadvertently was brought out earlier in the trial the attorneys have assured me that there is no scientific evidence available to prove that any substance found on the defendant's tennis shoes was related to or came from the crime scene.

Mr. Rankin now argues that the Trial Court erred by failing to grant a mistrial on account of the testimony given by Ms. Ruhl and Detective Dykes. Even if we assume that the testimony violated the Trial Court's order granting Mr. Rankin's motion *in limine*, we cannot say that the Trial Court erred by fail-

ing to order a mistrial in response to the violation in view of the ultimate failure of counsel to seek a mistrial and their agreement to the requested admonition. Generally speaking, a trial judge is under no duty to declare a mistrial *sua sponte. See, e.g., Lovelady v. State,* 326 Ark. 196, 199, 931 S.W.2d 430, 432 (1996). We typically decline to hold that a judge commits reversible error by failing to order a mistrial on his own motion when none was requested. *Edwards v. State,* 315 Ark. 126, 864 S.W.2d 866 (1993); *Meadows v. State,* 291 Ark. 105, 722 S.W.2d 584 (1987); *Floyd v. State,* 278 Ark. 86, 643 S.W.2d 555 (1982). Mr. Rankin "cannot complain on appeal because he received all of the relief he asked for at trial." *Stephens v. State,* 328 Ark. 81, 90, 941 S.W.2d 411, 416 (1997).

### 3. Mental retardation

Mr. Rankin further argues that the Trial Court erred by refusing to find that Mr. Rankin was mentally retarded at the time of the commission of the murders and was therefore ineligible for the death penalty under Ark. Code Ann. § 5-4-618 (Repl. 1993).

According to Ark. Code Ann. § 5-4-618(b), "[n]o defendant with mental retardation at the time of committing capital murder shall be sentenced to death." This provision was enacted by Act 420 of 1993. The statute provides that the defendant "has the burden of proving mental retardation at the time of committing the offense by a preponderance of the evidence." § 5-4-618(c). A defendant is entitled to a rebuttable presumption of mental retardation if his intelligence quotient ("IQ") is 65 or below, § 5-4-618(a)(2), but the definition of "mental retardation" encompasses more than an IQ score. The statute defines mental retardation as follows:

> (A) Significantly subaverage general intellectual functioning accompanied by significant deficits or impairments in adaptive functioning manifest in the developmental period, but no later than age eighteen (18); and

> (B) Deficits in adaptive behavior.

§ 5-4-618(a)(1)(A)-(B).

A defendant who wishes to invoke this provision must do so by written motion prior to trial. § 5-4-618(d)(1). If such motion is filed, the trial court must determine prior to trial whether the defendant is in fact mentally retarded. § 5-4-618(d)(2).

A finding by the trial court that the defendant is mentally retarded prevents the jury from being "death qualified." If the mentally retarded defendant is convicted of capital murder, the jury is required to sentence him to life imprisonment without the possibility of parole. § 5-4-618(d)(2)(B).

If the trial court rejects the defendant's argument and finds that the defendant is not mentally retarded, then the defendant may take his case to the jury. Despite the trial court's adverse determination, "the defendant may raise the question of mental retardation to the jury for determination de novo during the sentencing phase of the trial." § 5-4-618(d)(2)(A). If the defendant proceeds under this provision, the jury shall receive a special verdict form on mental retardation when it retires to consider mitigating and aggravating circumstances. § 5-4-618(d)(2)(A)(i). If the jury unanimously finds that the defendant was mentally retarded at the time of the commission of the capital offense, he is automatically sentenced to life imprisonment without the possibility of parole. § 5-4-618(d)(2)(A)(ii).

In a pretrial motion, Mr. Rankin moved the Trial Court to find him mentally retarded pursuant to § 5-4-618(d)(1). The Trial Court held a hearing on the motion, heard testimony, and ultimately denied the motion. Mr. Rankin elected not to present the issue of mental retardation to the jury under § 5-4-618(d)(2)(A). Thus, he appeals only the Trial Court's determination that he was not mentally retarded under this statute.

■ Although we have discussed this statute in past cases, *see Reams v. State,* 322 Ark. 336, 909 S.W.2d 324 (1995); *Fairchild v. Norris,* 317 Ark. 167, 876 S.W.2d 588 (1994); *Fairchild v. Norris,* 314 Ark. 221, 861 S.W.2d 111 (1993), we have not announced the standard by which we will review a trial court's ruling on the question of mental retardation under § 5-4-618. That issue is now before us. We analogize this case to those in which we have reviewed a trial court's determination of a defendant's fitness to

stand trial under Ark. Code Ann. § 5-2-302 (Repl. 1993). The standard there is whether the trial court's finding is supported by substantial evidence. *Key v. State*, 325 Ark. 73, 923 S.W.2d 865 (1996). We adopt the same standard for reviewing a trial court's determination under § 5-4-618. Thus, a trial court's finding that a defendant is not mentally retarded under § 5-4-618 will be affirmed if it is supported by substantial evidence.

The Trial Court's determination that Mr. Rankin was not mentally retarded at the time of the commission of the murders is supported by substantial evidence. At the hearing on Mr. Rankin's motion, the Trial Court received the testimony of David Nanak, a psychological examiner for the Southeast Arkansas Mental Health Center. Mr. Nanak testified that he administered the Wechsler Adult Intelligence Scale—Revised examination to Mr. Rankin in February 1995. As Mr. Nanak explained, this examination measures a person's IQ. Mr. Rankin scored a 66 on the February 1995 examination. According to Mr. Nanak, the test had a margin of error of 2.94 points.

Mr. Nanak testified that Mr. Rankin's IQ score of 66 placed him "in the mild range of mental retardation," which was from 50-69. Mr. Nanak explained that his conclusion was "based strictly on the numbers obtained through the intellectual testing. It is not a diagnosis. That was a classification he tested into."

However, Mr. Nanak testified that he reviewed the results of a second IQ test administered in September 1995 by Dr. Philip Murphy in Oklahoma City. Dr. Murphy's evaluation, done at the behest of defense counsel, showed that Mr. Rankin had an IQ of 72. Mr. Nanak testified that this reflected a six-point increase from his first score and that the standard variance between tests was three points. Mr. Nanak stated that this score removed Mr. Rankin from the "mild mental retardation" range. Mr. Nanak stated that it was his clinical impression that, based on the results of the September 1995 IQ test, Mr. Rankin was more accurately classified as "borderline intelligent," although it appears from the record that Dr. Murphy concluded that Mr. Rankin was "mildly to borderline mentally retarded." Mr. Nanak testified that Dr. Murphy's testing produced a "closer estimate of [Mr. Rankin's]

actual functioning level" than the February 1995 evaluation. Mr. Nanak testified that Dr. Murphy's "testing is probably more valid, more accurate than mine." Mr. Nanak stated that he endorsed the results obtained by Dr. Murphy's evaluation.

Mr. Nanak explained that the six-point difference in Mr. Rankin's two IQ scores was probably due in part to Mr. Rankin's adjustment to his incarceration. Mr. Nanak testified that he administered the February 1995 exam to Mr. Rankin in the county jail only a few months after his arrest. Mr. Nanak testified that Mr. Nanak probably had a high anxiety level at that point but that, by September 1995, he had probably adjusted. Mr. Nanak testified that he would expect Mr. Rankin to operate at a higher functioning level after having the opportunity to adjust to incarceration over the course of five or six months. Mr. Nanak conceded that a person who retakes an IQ test might achieve a higher score based simply on acquiring some degree of familiarity with the test, but he said that, in his experience, this would produce only a one- or two-point increase. Mr. Rankin achieved a six-point increase.

Mr. Nanak further testified that he administered the Wide Range Achievement test, an academic achievement test, and determined that Mr. Rankin was operating on fourth- or fifth-grade levels in reading and arithmetic. Mr. Nanak stated that Mr. Rankin told him that he had an eighth-grade education. He concluded that Mr. Rankin was functioning "somewhat behind" his education level.

Finally, Mr. Nanak testified that he conducted an interview with Mr. Rankin in which he found that Mr. Rankin was able to communicate, to understand what he is hearing, and to respond in a coherent manner. Mr. Nanak stated that he believed Mr. Rankin was concerned about his appearance and his place in public and that he was able to get along with others, function within a group, sustain relationships, and take care of his personal needs.

Dr. John Anderson, a psychologist with the forensic unit at the Arkansas State Hospital, testified that he had analyzed the evaluations performed by Mr. Nanak and Dr. Murphy and concluded that their reports were "reasonable assessments of [Mr. Rankin's]

functioning at the time he was evaluated." Dr. Anderson testified about the increase in Mr. Rankin's IQ score from a 66 to a 72. He explained that the five- to six-month interval between the two tests made it unlikely that the increase was due to any "test-retest effect." Dr. Anderson also indicated that the score on the portion of Mr. Rankin's IQ test that would have been most likely to increase on account of the "test-retest effect" did not increase. Finally, Dr. Anderson testified that he found Mr. Rankin to be polite but somewhat evasive, uncooperative, and malingering. Dr. Anderson stated that Mr. Rankin was able to understand what he was telling him and that he was "competent," "coherent," and was not suffering from a mental disease or defect at the time of the murders.

■ Mr. Rankin argues in his brief that the testimony introduced at the hearing established his entitlement to the rebuttable presumption of mental retardation under § 5-4-618(a)(2). We disagree. The testimony showed that Mr. Rankin scored a 66 on his first IQ test and a 72 on his second IQ test. These scores did not entitle Mr. Rankin to the presumption under § 618(a)(2). Under that provision, a defendant is entitled to the presumption only if his IQ is 65 or below. Mr. Rankin's scores do not fall within this range.

■ Moreover, Mr. Nanak testified that he believed the score of 72 was more accurate than the score of 66. He further indicated that he believed Mr. Rankin was "borderline intelligent" rather than "mildly mentally retarded." That testimony constitutes substantial evidence in support of the Trial Court's finding. We reject Mr. Rankin's suggestion that the Trial Court was obligated to accept the score of 66 over the score of 72 or to "reduce" these scores by the possible three-point margin of error or "average" them together in some way.

### 4.   Change of venue

Mr. Rankin also argues on appeal that the Trial Court erred by denying his motion to change the venue for his trial from Jefferson County. We affirm on this point.

Mr. Rankin filed a pretrial motion seeking a change of venue pursuant to Ark. Code Ann. § 16-88-204 (1987), and Article 2, § 10, of the Arkansas Constitution. The motion alleged that it would be "impossible to select a fair and impartial jury from Jefferson County as a result of pre-trial publicity" and recited various instances of such publicity including a newspaper article that had reprinted Mr. Rankin's custodial statements and a radio announcement that urged listeners to attend the trial of "the man who killed" the victims. The motion asserted that there had been "much discussion" about the case throughout the city.

Attached to Mr. Rankin's motion were affidavits from six Pine Bluff citizens who asserted that Mr. Rankin would not be able to "receive a fair trial in Jefferson County, Arkansas" on account of the press coverage and the "frequent" and "general" discussions about the case that had occurred throughout the local community.

The Trial Court held a hearing on Mr. Rankin's venue motion. Mr. Rankin first introduced the testimony of James Gregory, a Pine Bluff resident who sells insurance and also works as a funeral director and mortician. Mr. Gregory testified that he had frequent contact with "the general public" through his work and heard the case "discussed in several different places." Mr. Gregory stated that the people that he had encountered were of the "general opinion" that Mr. Rankin was guilty. According to Mr. Gregory, the public was simply wondering whether Mr. Rankin would receive the death penalty or life imprisonment. Mr. Gregory admitted that he encountered this sentiment mostly in the course of talking with Pine Bluff citizens.

Mr. Rankin also introduced the testimony of James Claybon, the general manager of KYDE, the Pine Bluff radio station that aired the announcement mentioned above. Mr. Claybon estimated that the announcement had been "sporadically" aired some twenty-seven times over the course of two or three weeks. Mr. Claybon indicated that KYDE is a twenty-four-hour gospel station on the AM frequency. He conceded that the station's signal reaches only 68 percent of Jefferson County's physical area and misses entire areas of the county and the city of Pine Bluff. He

could not pinpoint how much of the county's roughly 90,000 population receives the signal, but he testified that the Arbitron company had estimated that the station had roughly 38,000 mostly African-American listeners over a multi-county area that included Jefferson County.

Finally, Mr. Rankin presented the testimony of Jessie Pearl Jackson, a Pine Bluff resident who owns her own beauty shop. Ms. Jackson testified that she caters to men and women customers of various races and ages, approximately 75 percent of whom are African-American. Ms. Jackson testified that she sees an average of 30 customers per week, many of whom are from Jefferson County. Ms. Jackson testified that there was a consensus among her customers that Mr. Rankin is guilty and that her customers wondered why the State had to waste money on a trial. She asserted that if there were any people in the county who could give Mr. Rankin a fair trial, "they are not coming to my salon."

Arkansas Code Ann. § 16-88-201 provides as follows:

> Any criminal cause pending in any circuit court may be removed by the order of the court, or by the judge thereof in vacation, to the circuit court of another county whenever it shall appear, in the manner provided in this subchapter, that the minds of the inhabitants of the county in which the cause is pending are so prejudiced against the defendant that a fair and impartial trial cannot be had in that county.

The most important aspect of the issue concerning the effect of pretrial publicity upon the minds of the inhabitants of the county in which the case is to be tried is whether a fair jury can be selected. At the outset of Mr. Rankin's trial, the Trial Court mentioned that there had been some press coverage of the case. He asked the pool of potential jurors if they had independent knowledge of the case beyond the press accounts. Some answered yes; many said they had not formed an opinion about Mr. Rankin's guilt or innocence and would not be biased. Others mentioned that they would be biased, and they were excused. Defense counsel specifically asked if anyone had heard radio-station announcements, and none responded affirmatively. Many could not recall hearing any pretrial publicity. Those who could

recall hearing press coverage stated that they had formed no opinions as to Mr. Rankin's guilt or innocence and could be fair and impartial and decide the case based on what was presented to them. Then the judge asked what he called a "catch-all question":

> . . . ladies and gentlemen, is there anything that any of you know about your situation, your mind set, or whatever, that would keep you from listening to the testimony and the evidence and making a decision at the conclusion of this case based only on what you hear in this courtroom in the way of evidence and the law as the Court would instruct you?

There was no response, and the Trial Court responded, "All right."

■ "There can be no error in the denial of a change of venue if an examination of the jury selection shows that an impartial jury was selected and that each juror stated he or she could give the defendant a fair trial and follow the instructions of the court." *Bell v. State,* 324 Ark. 258, 264, 920 S.W.2d 821, 824 (1996). Nor was Mr. Rankin entitled to jurors who were "totally ignorant of the facts surrounding the case, as long as they can set aside any impression they have formed and render a verdict solely on the evidence at trial." *Gardner v. State,* 296 Ark. 41, 52, 754 S.W.2d 518, 523 (1988).

■ In addition, we note that Mr. Rankin used only eleven of the twelve peremptory challenges he was allowed during the selection of the jurors. His counsel attempted to use the twelfth challenge against a prospective alternate juror after the twelve regular jurors had been chosen, but they were not allowed to do so. That ruling was correct. *See* Ark. Code Ann. § 16-30-102(c) (Repl. 1994). Having failed to exhaust his peremptory challenges prior to the seating of the jury, Mr. Rankin is in no position to demonstrate prejudice from a ruling denying his venue motion. *Oliver v. State,* 322 Ark. 8, 907 S.W.2d 706 (1995).

■ In light of the testimony introduced at the hearing which showed less-than-pervasive publicity, the failure of Mr. Rankin to demonstrate during *voir dire* that there were publicity-affected jurors, and the fact that he did not use all his peremptory

challenges, we cannot say that the Trial Court abused his discretion by denying Mr. Rankin's change-of-venue motion.

## 5. *Death penalty*

Mr. Rankin also argues that the Trial Court erred by denying his motion to declare the death-penalty statute unconstitutional. We also affirm on this point.

The State charged Mr. Rankin with three counts of capital murder pursuant to Ark. Code Ann. § 5-10-101(a)(4) (Repl. 1993), which provides that "[a] person commits capital murder if . . . [w]ith the premeditated and deliberated purpose of causing the death of another person, he causes the death of any person . . . ." The information did not charge Mr. Rankin with any other offense, and Mr. Rankin did not object to the capital-murder instructions or request that instructions be given on any other offense.

In a pretrial motion, Mr. Rankin requested the Trial Court to quash the information on the ground that § 5-10-101(a)(4) is unconstitutional due to its "overlap" with the first-degree murder statute at § 5-10-102(a)(2). He asserted that first-degree murder is a "lesser-included offense" of capital murder and that the two offenses were "identical." He claimed that he would have a right to an instruction on any lesser-included offenses at trial and that due process required that the jury be able to consider, and convict on, any lesser-included offense. Mr. Rankin also claimed that our statutory scheme is unconstitutional because it fails to provide the jury with any standard by which to differentiate between the offenses of capital murder and first-degree murder. Mr. Rankin further contended that our statutory scheme is unconstitutionally void for vagueness and that it fails to guarantee equal protection of the laws because it provides for different punishments for the same conduct depending on whether the State charges the defendant with capital murder or first-degree murder.

Mr. Rankin repeats most of these arguments on appeal. With respect to the argument that the jury was provided with no standard to differentiate between capital murder and first-degree murder, we point out that Mr. Rankin was not charged

with first-degree murder and that Mr. Rankin did not request an instruction on that offense. The only choice given to the jury was to convict on the capital-murder counts or to acquit. In any event, we have rejected Mr. Rankin's "overlap" and "vagueness" arguments in numerous cases. *See, e.g., Lee v. State,* 327 Ark. 692, 942 S.W.2d 231 (1997); *Nooner v. State,* 322 Ark. 87, 907 S.W.2d 677 (1995). We also have rejected the claim that our statutory scheme creates an arbitrary classification in violation of the Equal Protection Clause. *See, e.g., Miller v. State,* 273 Ark. 508, 621 S.W.2d 482 (1981). *See also Cannon v. State,* 286 Ark. 242, 690 S.W.2d 725 (1985); *Penn v. State,* 284 Ark. 234, 681 S.W.2d 307 (1984).

## 6. Suppression hearing

We finally address Mr. Rankin's assertion that the Trial Court erred by admitting into evidence his custodial statements without conducting a suppression hearing. We remand the case so that such a hearing may be conducted.

Mr. Rankin gave two incriminating statements to the police on the day of his arrest that are discussed in detail at the outset of this opinion. In a pretrial motion filed on September 12, 1995, Mr. Rankin moved to suppress the statements. In his motion, he claimed that he made the statements while suffering from mental disease or defect and that this condition rendered him incapable of knowingly and intelligently waiving his right against self-incrimination. Mr. Rankin asserted that he made the statements as a result of fatigue and confusion, his youth and lack of education, mild retardation, and his inability to understand the nature of the questioning. Mr. Rankin alleged that he did not realize he was confessing to the murder of three people and that he was only "agreeing" to the police's statements. Mr. Rankin further alleged that he did not realize that he was entitled to counsel before answering the detectives' questions. He claimed he had requested to see his mother and brother so that they could get him a lawyer, but he said that he was advised by the detectives that he did not need a lawyer. Mr. Rankin maintained that admitting the confession into evidence would violate his right against self-incrimina-

tion, and he specifically requested that the Trial Court hold a hearing on, and ultimately grant, his motion to suppress.

The record contains no account of any hearing that occurred in response to Mr. Rankin's suppression motion, and it contains no ruling by the Trial Court on the motion.

During the State's case-in-chief, the prosecutor was examining Detective James Cooper of the Pine Bluff Police Department about his interrogation of Mr. Rankin. The prosecutor asked Detective Cooper a question concerning statements made by Mr. Rankin that were not recorded. Defense counsel objected that such statements were not admissible because they were not recorded, and the Trial Court overruled the objection. Shortly thereafter, the prosecutor offered into evidence Mr. Rankin's inculpatory statements that were recorded, and they were received without objection.

According to Ark. Code Ann. § 16-89-107(b)(1) (1987),

> . . . the determination of fact concerning the admissibility of a confession shall be made by the court when the issue is raised by the defendant; the trial court shall hear the evidence concerning the admissibility and the voluntariness of the confession out of the presence of the jury, and it shall be the court's duty before admitting the confession into evidence to determine by a preponderance of the evidence that the confession has been made voluntarily.

Here, the admissibility of Mr. Rankin's custodial statements was clearly "raised by the defendant" by way of Mr. Rankin's pretrial motion to suppress. That motion asserted that the statements should be suppressed because they were not made following a knowing and intelligent waiver by Mr. Rankin of his right against self-incrimination. Despite the State's contention that Mr. Rankin "abandoned" his suppression effort by failing to object to the admissibility of the statements when they were introduced at trial, Mr. Rankin's pretrial suppression motion was all that was required by the statute to raise the issue to the Trial Court and trigger its obligation to hold a hearing and address Mr. Rankin's claims. *Moore v. State,* 303 Ark. 1, 791 S.W.2d 698 (1990); *Bucy v. State,* 271 Ark. 768, 610 S.W.2d 576 (1981). We

know of no authority, and the State cites none, that requires a defendant to raise the question of the admissibility of his incriminating custodial statements more than once.

As the record contains no account of any hearing held by the Trial Court in response to Mr. Rankin's motion, caution requires that we remand this case with instructions to the Trial Court to conduct a hearing on the record for the limited purpose of determining whether Mr. Rankin made the statements to the police after knowingly and intelligently waiving his constitutional rights. *See Moore v. State, supra; Chenowith v. State,* 247 Ark. 472, 445 S.W.2d 889 (1969)(Fogleman, J., concurring); *Estep v. State,* 244 Ark. 843, 427 S.W.2d 535 (1968) (Fogleman, J., concurring).

Section 16-89-107(b)(1) directs the trial court to "hear the evidence concerning the admissibility and the voluntariness" of the custodial statement and to determine, before admitting the statement into evidence, whether it has been made "voluntarily." We recognize that Mr. Rankin did not move to suppress his incriminating statements on the basis that they were involuntarily given. Rather, he based his motion on the assertion that he failed to make a knowing and intelligent waiver of his constitutional rights prior to making the statement. As we have noted, there is a difference between the concept of an involuntary statement and a statement made without a knowing and intelligent waiver of one's constitutional rights. *See Mauppin v. State,* 309 Ark. 235, 246-47, 831 S.W.2d 104, 109-110 (1992).

The language of § 16-89-109(b)(1) appears to require the trial court to consider only whether the statement was "voluntary" when the admissibility of the statement has been raised by the defendant. Our cases, however, clearly require the trial court, if the defendant has alleged that his statement is inadmissible due to the lack of a waiver, to consider in a suppression hearing whether the statement was made after a knowing and intelligent waiver of his constitutional rights. *See, e.g, Moore v. State, supra.* Depending on the argument presented by the defendant in his suppression motion, a trial court should determine in the hearing whether the statement is inadmissible on account of its involunta-

riness or the lack of an effective waiver, or perhaps both of these grounds.

As we have done in other cases, *see Williams v. State,* 327 Ark. 97, 102, 938 S.W.2d 547, 550 (1997), we employ the "limited–remand procedure" here and direct the Trial Court on remand to hold a hearing on the record for the limited purpose of considering the arguments and allegations presented in Mr. Rankin's pretrial suppression motion. If the Trial Court determines, at the conclusion of the hearing, that the statements were not given after a knowing and intelligent waiver, the Trial Court should suppress the statements and order a new trial. If the Trial Court determines that Mr. Rankin made his statements after knowingly and intelligently waiving his constitutional rights, a new trial will not be required. *Moore v. State, supra; Harris v. State,* 271 Ark. 568, 609 S.W.2d 48 (1980); *Guinn v. State,* 27 Ark. App. 260, 771 S.W.2d 290 (1989).

### 7. *Ark. Sup. Ct. R. 4-3(h)*

In accordance with Ark. Sup. Ct. R. 4-3(h), the record has been reviewed for erroneous rulings prejudicial to Mr. Rankin, and none has been found.

Remanded.