2010 Ark. 240

**T.C., a Minor, Appellant,**

v.

**STATE of Arkansas, Appellee.**

No. 09–1128.

Supreme Court of Arkansas.

May 14, 2010.

55

Dorcy Kyle Corbin, Ark. Pub. Defender Comm'n, for appellant.

Dustin McDaniel, Att'y Gen., by: Deborah Nolan Gore, Ass't Att'y Gen., for appellee.

Steven A. Drizin, Joshua A. Tepfer, Laura H. Nirider, for amicus curiae Center on Wrongful Convictions of Youth.

ROBERT L. BROWN, Justice.

Appellant T.C., a minor, appeals from an order of the Ouachita County Circuit Court adjudicating him delinquent on the charge of second-degree murder for the death of his sister, Kaylee, and committing him to the Division of Youth Services. He raises six points on appeal: (1) that the circuit judge erred by denying his motion to suppress his statement; (2) that the circuit judge erred in finding that his statement was reliable; (3) that there was

insufficient evidence for the circuit judge to adjudicate him delinquent on the charge of second-degree murder; (4) that the circuit judge erred by denying his motion to dismiss based on the State's failure to provide exculpatory evidence; (5) that the circuit judge's disposition order was contrary to law; and (6) that the circuit judge violated his right to remain silent under the Fifth and Fourteenth Amendments.

On the morning of August 7, 2006, police officers of the Camden Police Department responded to a 911 call from T.C.'s residence, which he shared with his mother, Melody Jones, and his eleven-year-old sister, Kaylee. T.C. at the time was twelve years old. Upon their arrival, the police officers found Kaylee dead on her bed with her hands bound together in the front of her body with what was later determined to be a dog leash and her feet bound together with a cloth measuring tape. The police officers learned that Kaylee had been found with two plastic shopping bags over her head, which her mother had removed when she discovered Kaylee on her bed. The cause of Kaylee's death was later determined to be suffocation.

The police officers concluded that they were dealing with a potential homicide and quickly cleared and secured the residence. While police investigators processed the house for evidence, T.C. and his mother waited outside in a relative's vehicle. Some time after noon, the police officers asked the relative to drive T.C. and his mother to the Camden Police Station where it was cooler and where they would not have to witness the removal of Kaylee's body from the residence. The relative then drove T.C. and his mother to the police station where they waited in the station's break room with family.

Having discovered no evidence of forced entry into the home, the police officers returned to the police station to interview T.C. and his mother. Melody Jones was interviewed first at approximately 4:30 that afternoon, while T.C. waited in the break room with his family. Jones's interview lasted approximately one hour and was videotaped in its entirety in the station's interview room. Following Jones's interview, police officers interviewed T.C. with his mother's permission in the interview room. T.C.'s interview began at approximately 5:30 p.m.[1] Forty-five minutes into the interview, he was advised of his *Miranda* rights, and he signed a waiver-of-rights form. The interview continued until 6:45 p.m., when T.C. told the police officers that he was hungry. At that point, he was taken from the interview room to a detective's office, and the officers went to pick up some food for him. The portion of T.C.'s interview that occurred from 5:30 p.m. to 6:45 p.m. was videotaped by the police department.

What happened during the ensuing time period was testified to at the suppression hearing and trial by the police officers and deputy prosecuting attorney. While T.C. was eating his dinner in the detective's office, Deputy Prosecuting Attorney Gregg Parish talked with him for five to ten minutes about school, video games, and the things his sister liked. After Parish left, Officer Scott Wells spoke with T.C. about their shared interest in video games and science fiction. Officer Evin Zeek joined T.C. and Wells sometime later. After listening to T.C.'s and Wells's conversation for awhile, Zeek turned the conversation to what had happened to Kaylee the night before. According to the police officers, T.C. soon became frustrated when they

---

1. The time that T.C.'s initial interview began was disputed at oral argument. According to T.C.'s counsel, the initial interview began closer to 5:00 p.m.

began to point out inconsistencies in his version of what had happened the previous night. At some point later in the conversation, T.C. asked, "If I tell the truth, what's gonna happen? Do you think I can get probation?" After the police officers told T.C. that they did not know what would happen to him, he proceeded to tell them that he had placed plastic bags over his sister's face and bound her hands and feet. During part of the time that T.C. was in the detective's office, Melody Jones was being interviewed in the interview room.

Because the interview in the detective's office was not recorded, the police officers then took T.C. back to the interview room to record his confession. The videotaped interview that followed began at approximately 10:20 p.m. with Officer Zeek again advising T.C. of his *Miranda* rights. After T.C. stated that he understood his rights, Officer Zeek moved on to the waiver-of-rights form and the following colloquy occurred:

> OFFICER ZEEK: At the bottom is what we call a Waiver of Rights Okay, and I will read it to you quickly. It says no promises or threats have been used against me to induce me to waive rights listed above. With full knowledge of my rights, I hereby voluntarily, knowingly, and intelligently waive them and agree to answer questions. Do you understand the Waiver?
>
> T.C.: No, what is a waiver?
>
> OFFICER ZEEK: It simply says that what you are saying, you are doing of your own free will.
>
> T.C.: Okay.
>
> OFFICER ZEEK: Okay. We haven't made any promises. We haven't threatened you in any way. You are doing this because you want to do this. Okay. And again, it is by your own free will

> that you do this, that you make this statement.
>
> T.C.: Yes.
>
> OFFICER ZEEK: Do you understand that?
>
> T.C.: Yes.

T.C. then signed the waiver-of-rights form and gave his confession.

On August 15, 2006, the State filed a petition for delinquency charging T.C. with first-degree murder for the death of his sister and moved to designate him as an extended-juvenile-jurisdiction offender under Arkansas Code Annotated section 9–27–503. Following a fitness-to-proceed evaluation in accordance with section 9–27–502, the circuit judge found that T.C. was fit to proceed and that at the time he engaged in the conduct charged he had the capacity to possess the necessary mental state required for the offense charged, to conform his conduct to the requirements of the law, and to appreciate the criminality of his conduct.

On February 13, 2007, T.C. moved to suppress his statement and alleged that it had been elicited in violation of his rights under the Fifth and Sixth Amendments to the United States Constitution; that he had not knowingly, intelligently, and voluntarily consented to giving a statement or waiving counsel due to his youth and immaturity; that his mother was not an appropriate person to consent to his questioning because she was also a suspect; and that his statement was coerced by threats from the deputy prosecuting attorney to charge him as an adult and was thus involuntary and false.

After a hearing on the matter, the circuit judge granted the State's request to have the matter designated an extended-juvenile-jurisdiction case under section 9–

27–503.[2] T.C. next filed a motion to reject waiver and a supplemental motion to suppress his statement, arguing, among other things, that neither his waiver nor his confession had been voluntarily, knowingly, or intelligently made; that his confession was inconsistent with the evidence and thus unreliable; and that his confession was the result of an illegal interrogation, as the police had violated Rules 2.2 and 2.3 of the Arkansas Rules of Criminal Procedure and Arkansas Code Annotated section 9–27–317(h).

On August 27, 2007, the State filed an amended petition for delinquency, reducing the charge against T.C. to second-degree murder.[3] Following pretrial hearings on August 31, 2007, and October 29, 2007, the circuit judge entered an order denying T.C.'s motions to suppress his statement and his motion to reject his waiver of rights. Specifically, the circuit judge found that the State had met its burden in proving that T.C.'s waiver of rights was freely, voluntarily, and intelligently made; that under the totality of the circumstances T.C.'s statement should not be suppressed; that T.C. understood the consequences of the waiver |₇and that it was not the result of any coercion, force, or inducement; that T.C.'s confession was not unreliable and was given of his own free will; and that the police had not violated Rules 2.2 and 2.3 of the Arkansas Rule of Criminal Procedure or Arkansas Code Annotated section 9–27–317(h).

Following a bench trial on March 18, 19, 20, and 24, 2008, the circuit judge found T.C. to be delinquent on the charge of the second-degree murder. A disposition hearing was held on August 15, 2008, after which, T.C. was committed to the Division of Youth Services with the condition that if he was released prior to his eighteenth birthday, he would be placed on probation until his eighteenth birthday.

■ T.C. appealed his delinquency order and disposition to the court of appeals, and the court of appeals affirmed. *See T.C. v. State*, 2009 Ark.App. 604, 342 S.W.3d 832. T.C. next filed a petition for review with this court, which we granted. When we grant review, we treat the appeal as if it were originally filed in this court. *See, e.g., McClanahan v. State*, 2010 Ark. 39, 358 S.W.3d 900.

## I. *Sufficiency of the Evidence*

■ On appeal, T.C. asserts that the circuit judge erred by failing to grant his motion to dismiss on the basis that the State failed to prove that he "knowingly" caused the death of his sister, which is an essential element of second-degree murder under Arkansas Code Annotated section 5–10–103(a)(1). Although he raises this issue as his third point on appeal, |₈double-jeopardy concerns require this court to review his sufficiency-of-the-evidence argument first. *See, e.g., Rounsaville v. State*, 2009 Ark. 479, 346 S.W.3d 289.

T.C. urges that his confession was insufficient to establish that he knowingly murdered his sister and that his confession, in fact, establishes just the opposite. According to T.C., he never stated that he knew his sister had died or that he thought she had died, and he consistently denied having any intent to hurt his sister. In

**2.** The circuit judge's order, entered on June 27, 2007, stated that T.C. did not oppose the State's request for an extended-juvenile-jurisdiction designation.

**3.** Because of the reduction of the charge against T.C., he was no longer eligible for an extended-juvenile-jurisdiction designation. *See* Ark.Code Ann. § 9–27–501(a)(1) (juveniles under thirteen years of age eligible for extended juvenile jurisdiction for the charges of capital murder and murder in the first degree).

addition, he points to portions of his confession that reflect actions he took which, he asserts, show that he did not knowingly kill his sister. For example, he underscores the fact that he told police that he held a shopping bag over his sister's head but stopped when she began to jerk, that he tied her up to slow her down from coming after him, and that he later went back to loosen the bags around Kaylee's head "so air would get in there."

 Before considering the merits of this point on appeal, this court must first determine whether the issue was properly preserved for appellate review. *See Maxwell v. State*, 359 Ark. 335, 197 S.W.3d 442 (2004). This court treats a motion to dismiss in a bench trial as a challenge to the sufficiency of the evidence. *See Law v. State*, 375 Ark. 505, 292 S.W.3d 277 (2009); *Springs v. State*, 368 Ark. 256, 244 S.W.3d 683 (2006). Under the Juvenile Code, the Arkansas Rules of Criminal Procedure apply to delinquency proceedings. *See* Ark. Code Ann. § 9–27–325(f) (Repl.2009); *see also Jones v. State*, 347 Ark. 409, 64 S.W.3d 728 (2002).

Rule 33.1 of the Arkansas Rules of Criminal Procedure governs motions to dismiss in bench trials and provides in relevant part as follows:

(b) *In a nonjury trial, if a motion for dismissal is to be made, it shall be made at the close of all of the evidence.* The motion for dismissal shall state the specific grounds therefor. If the defendant moved for dismissal at the conclusion of the prosecution's evidence, then the motion must be renewed at the close of all of the evidence.

(c) The failure of a defendant to challenge the sufficiency of the evidence at the times and in the manner required in subsections (a) and (b) above will constitute a waiver of any question pertaining to the sufficiency of the evidence to support the verdict or judgment. A motion for directed verdict or for dismissal based on insufficiency of the evidence must specify the respect in which the evidence is deficient. *A motion merely stating that the evidence is insufficient does not preserve for appeal issues relating to a specific deficiency such as insufficient proof on the elements of the offense.* A renewal at the close of all of the evidence of a previous motion for directed verdict or for dismissal preserves the issue of insufficient evidence for appeal. If for any reason a motion or a renewed motion at the close of all of the evidence for directed verdict or for dismissal is not ruled upon, it is deemed denied for purposes of obtaining appellate review on the question of the sufficiency of the evidence.

(Emphasis added.)

 This court strictly construes Rule 33.1. *Grady v. State*, 350 Ark. 160, 85 S.W.3d 531 (2002). Based on the language of Rule 33.1, this court has held that to preserve a challenge to the sufficiency of the evidence in a bench trial, a criminal defendant must move to dismiss at the close of the evidence. *See, e.g., Maxwell*, 359 Ark. at 337, 197 S.W.3d at 443. Furthermore, this court has held, in light of Rule 33.1, that the motion must be specific enough to advise the circuit court of the exact element of the crime that the State has failed to prove. *E.g., Pratt v. State*, 359 Ark. 16, 194 S.W.3d 183 (2004). The rationale behind this rule is that "when specific grounds are stated and the absent proof is pinpointed, the circuit court can either grant the motion, or, if justice requires, allow the State to reopen its case and supply the missing proof." *Pinell v. State*, 364 Ark. 353, 357, 219 S.W.3d 168, 171 (2005); *see also Pratt*, 359 Ark. at 23–24, 194 S.W.3d at 187–88. A general motion merely asserting that the State has

failed to prove its case is inadequate to preserve the issue on appeal. *E.g., Beavers v. State,* 345 Ark. 291, 46 S.W.3d 532 (2001).

Mindful of these standards, we turn to the motions made by the defense. At the close of the State's evidence, T.C.'s counsel made the following motion to dismiss: "The State has failed to provide sufficient evidence that [T.C.] can be adjudicated on a Second Degree Murder charge. They have not met the requisite elements for that charge." The circuit judge denied the motion. At the close of the defense's evidence, T.C.'s counsel renewed the motion to dismiss, saying: "I need to renew my motion for dismissal based on the insufficiency of the evidence. Specifically, the fact that they have failed to prove beyond a reasonable doubt each and every element of this offense." Defense counsel then proceeded to argue at length that T.C.'s confession was unreliable based on the evidence presented at trial and the circumstances under which it was taken, before concluding: "even with the statement in, there is still insufficient evidence of proof that [T.C.] intended to kill his sister."

The circuit judge denied the renewed motion to dismiss, and because the parties had waived closing arguments, took the case under consideration. A hearing to announce a decision in the case was scheduled for April 3, 2008. On April 2, 2008, T.C. filed a "Brief in Support of Motion to Dismiss," arguing, among other things, that there was insufficient evidence to establish that T.C. had "knowingly" caused the death of his sister, an essential element of second-degree murder under section 5–10–103(a)(1), which provides that a person commits murder in the second degree if the person "knowingly causes the death of another person under circumstances manifesting extreme indifference to the value of human life." A person acts "knowingly" with respect to a result of the person's conduct "when he or she is aware that it is practically certain that his or her conduct will cause the result." Ark.Code Ann. § 5–2–202(2)(B).

What is clear from the above discussion is that T.C. made general motions to dismiss at the close of the State's evidence and at the close of the defense's evidence. Neither of these motions was specific enough to advise the circuit court of the exact element of the crime that the State had failed to prove—that T.C. had knowingly caused the death of his sister. Thus, neither motion preserved T.C.'s sufficiency-of-the-evidence argument on appeal. *See, e.g., Pratt v. State,* 359 Ark. 16, 194 S.W.3d 183 (2004).

This court has held that sufficiency-of-the-evidence challenges were not preserved when motions were made after closing arguments had begun, *see McClina v. State,* 354 Ark. 384, 123 S.W.3d 883 (2003); *State v. Holmes,* 347 Ark. 689, 66 S.W.3d 640 (2002), and when motions were made after the jury had been charged, *see Rankin v. State,* 329 Ark. 379, 948 S.W.2d 397 (1997); *Webb v. State,* 326 Ark. 878, 935 S.W.2d 250 (1996). Similarly, we conclude that a brief in support of a motion to dismiss in a bench trial that is made some days after the case is taken under advisement by the judge is untimely and does not cure a defective motion to dismiss under Rule 33.1.

In sum, T.C. failed to make a motion to dismiss at the close of all of the evidence that was specific enough to advise the circuit court of the exact element of the crime that the State had failed to prove. Though T.C.'s counsel stated that there was no proof that T.C. intended to kill his sister, counsel did not argue the failure to prove the specific element of the offense for second-degree murder, that is, that T.C. did not knowingly cause the death of

another person under circumstances manifesting extreme indifference to the value of human life. By the time that T.C. did raise a specific argument in his posttrial brief, it was too late. T.C.'s attempt to renew the motion to dismiss was not "at the close of all of the evidence" and was, therefore, untimely. We hold that T.C. failed to comply with Rule 33.1, and, thus, sufficiency of the evidence is not an issue preserved for our review.

## II. *Motion to Suppress His Confession*

T.C. makes several arguments in support of his assertion that the circuit judge erred by denying his motion to suppress his confession: (1) that the *Miranda* warnings were not given until forty-five minutes into his first interview, and this failure tainted his later confession; (2) that the waiver of his *Miranda* rights was not voluntary, knowing, and intelligent; (3) that the consent of Jones to T.C.'s interview was invalid because, as a suspect, her interest was adverse to T.C.'s; (4) that the confession was the result of police coercion; (5) that the confession was the result of violation of Arkansas Rules of Criminal Procedure 2.2 and 2.3; and (6) that the confession was not reliable.

▉▉▉▉ |₁₃We focus initially on whether T.C.'s waiver of *Miranda* rights was voluntary, knowing, and intelligent. That determination involves the consideration of two components, both of which must be satisfied. *See Otis v. State*, 364 Ark. 151, 217 S.W.3d 839 (2005). The first component involves the voluntariness of the waiver

and concerns whether the waiver was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Id.* The second component involves whether the defendant made the waiver knowingly and intelligently and concerns whether the waiver was made with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* In making these decisions, this court reviews the totality of the circumstances surrounding the waiver, including the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; the use of mental or physical punishment; and statements made by the interrogating officers and the vulnerability of the defendant. |₁₄*Jordan v. State*, 356 Ark. 248, 147 S.W.3d 691 (2004).[4] This court will reverse a circuit judge's ruling on this issue only if it is clearly against the preponderance of the evidence. *Id.*

▉▉▉▉ Using the totality-of-the-circumstances analysis, we conclude that T.C.'s waiver was not knowingly and intelligently made. While a defendant's youth is a factor to be considered in determining whether a juvenile knowingly and intelligently waived his or her *Miranda* rights, it is generally not enough, standing alone, to prove that he or she is incapable of knowingly and intelligently waiving *Miranda* rights. For example, in *Otis v. State*, 364 Ark. 151, 217 S.W.3d 839 (2005), this court held that a fourteen-year-old with a func-

---

4. Both parties reference Arkansas Code Annotated section 9–27–317(c) in their arguments on this point. That section provides a list of seven factors that must be considered in "determining whether a juvenile's waiver of the right to counsel at any stage of the proceeding was made freely, voluntarily, and intelligently." Section 9–27–317(c) refers to the juvenile's right to counsel at "any stage of the proceeding." Under section 9–27–310(a), proceedings are commenced by filing a petition with the circuit clerk of the circuit court or by transfer from another court. Accordingly, the situation at issue under this point occurred prior to the commencement of proceedings under the Juvenile Code, and section 9–27–317(c) does not appear to be apposite.

tional age of nine to twelve years old had knowingly and intelligently waived his rights where officers had carefully explained what the words on the waiver form meant, where Otis had asked no questions, and where he had indicated that he understood the form. The court also noted that Otis's mother was present when he signed the form.

Similarly, in *Sanford v. State,* 331 Ark. 334, 962 S.W.2d 335 (1998), this court held that a sixteen-year-old with an Intelligence Quotient of 67 had knowingly waived his *Miranda* rights under the totality of the circumstances. Testimony regarding those circumstances showed that he understood the statements on the waiver form, that he had not asked any questions about the form, and that his father had been present during the execution of the waiver forms. Likewise, in *Oliver v. State,* 322 Ark. 8, 907 S.W.2d 706 (1995), we held that a fifteen-year-old with the mental age equivalent of a twelve-year-old had knowingly and intelligently waived his rights where testimony from the suppression hearing showed that the arresting officers had explained the waiver-of-rights form to Oliver and that he appeared to understand it.

A common thread running through these cases is that the defendants had their rights carefully explained to them and either asked no questions or otherwise did not express confusion about the meaning of the waiver-of-rights form. In contrast, T.C. was given no explanation of the waiver-of-rights form the first time he signed it and instead was merely asked to read it for himself. The second time he was asked to sign the form, he said that he did not understand what "waiver" meant. Instead of explaining what waiver meant, the police gave T.C. the definition of voluntariness, saying: "what you are saying, you are doing of your own free will ... [w]e haven't made any promises. We haven't threatened you in any way. You are doing this because you want to do this. And again, it is by your own free will that you do this, that you make this statement."

This definition of what "waiver" means was patently wrong. As a result, we conclude, based on T.C.'s question and the police officer's explanation, that T.C. did not understand the meaning of waiver. Waiver, of course, is routinely defined as the "intentional relinquishment or abandonment of a known right or privilege." *See Pratt v. State,* 359 Ark. 16, 194 S.W.3d 183 (2004) (quoting *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977)). In laymen's terms, it is "giving up" something, in this case the right to be silent and the right to counsel. The police officer's explanation imparted to T.C. did not make clear that he was giving up his rights to remain silent and to the assistance of counsel. It necessarily follows then that T.C.'s waiver was not made with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *E.g., Otis v. State,* 364 Ark. at 161, 217 S.W.3d at 845. And that is the crucial test. We hold that the circuit judge's finding that T.C. knowingly and intelligently waived his rights was clearly against the preponderance of the evidence. For this reason, we suppress T.C.'s confession. Because we suppress the confession due to T.C.'s lack of a knowing and intelligent waiver of his rights under *Miranda,* it is unnecessary to address the other grounds presented for suppression.

### III. *Brady Violation*

Because we remand for a new delinquency proceeding, we will address only those issues likely to recur on retrial. *See, e.g., Burton v. State,* 367 Ark. 109, 238 S.W.3d 111 (2006).

■ T.C. asserts that the State violated his due-process rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose a tape recording of an interview the police officers had ₁₇with Chico Spinks, an acquaintance of T.C.'s mother, which allegedly contained exculpatory statements regarding T.C.'s guilt. The circuit judge, in denying T.C.'s motion to dismiss for the alleged *Brady* violation, found that there was insufficient evidence that a recording of the Spinks interview with police officers existed and that the State had provided Spinks's name and the substance of his statement to the defense. The judge further noted that the defense had not interviewed Spinks or called him to testify at the delinquency trial.

■ Under the *Brady* decision, the State is required to disclose all favorable evidence material to the guilt or punishment of the defendant. In *Strickler v. Greene,* 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), the Supreme Court outlined the three elements of a true *Brady* violation: (1) evidence exists that is favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) prejudice resulted to the defendant. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Cook v. State,* 361 Ark. 91, 105, 204 S.W.3d 532, 540 (2005) (quoting *Strickler,* 527 U.S. at 280, 119 S.Ct. 1936). The defendant has the burden of proving a *Brady* violation. *Carter v. Bell,* 218 F.3d 581, 601 (6th Cir.2000) (citing *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972)).

■ Applying these principles, we conclude that T.C. has failed to meet his burden of proving a *Brady* violation. Initially, T.C. failed to establish to the circuit judge's satisfaction that the Spinks tape recording even exists. But even assuming that a tape recording of Spinks ₁₈does exist, T.C. has not shown that the evidence was suppressed by the State. Evidence is not "suppressed" if the defendant either knew about it or should have known of the essential facts permitting him to take advantage of any exculpatory evidence. *United States v. LeRoy,* 687 F.2d 610 (2d Cir.1983), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983); *see also United States v. Diaz,* 922 F.2d 998, 1007 (2d Cir.1990) ("There is no improper suppression within the meaning of *Brady* where the facts are already known by the defendant."). In the instant case, the State gave the defense Spinks's name and the substance of his statement to the police officers, which was that T.C.'s mother, Melody Jones, had talked about Kaylee's death in her sleep. Hence, T.C. was on notice that Spinks had information that might have helped in his defense. Yet, despite having this information, T.C. failed to subpoena Spinks as a witness to testify in his defense; nor did T.C.'s counsel interview him.

Further, even if this court were to determine that the State had suppressed evidence of Spinks's statement, T.C. has not met his burden of showing that the evidence was exculpatory. T.C. claims that Spinks told the police that T.C.'s mother had admitted in her sleep to killing Kaylee. However, the record reveals that Spinks told police that T.C.'s mother sat up in bed and began talking about Kaylee's death, using different voices for Kaylee and T.C. Such a statement alone neither exculpates T.C. nor inculpates his mother.

Moreover, T.C. has failed to show that the Spinks evidence was material within the meaning of the *Brady* rule. Again,

evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Here, there is nothing to indicate that the result of T.C.'s delinquency proceeding would have been different had the defense been in possession of a recording of Spinks's statement to police. Most significantly in this regard, the circuit judge was aware of the substance of Spinks's statement to police.

As a final point, T.C.'s claim that the Spinks recording, if it existed, was essential to the impeachment of the police officers and Melody Jones is not persuasive. Jones, although called as a witness for the defense, was never asked about Spinks, his alleged statement to the police, or whether she had made the statements alleged by T.C. As to the argument that the tape was essential to impeaching the police officers' testimony that Spinks was drunk when he gave the statement to police, we fail to see how this would have caused the result of the proceeding to be different. We hold that T.C. has failed to meet his burden of showing that a *Brady* violation occurred. Having held as we do, we emphasize that if the Chico Spinks tape does exist, it should be turned over to the defense on remand.

### IV. *The Circuit Judge's Disposition*

We address a second issue because it too may recur at a retrial of the matter. T.C. contends that Arkansas Code Annotated section 9–27–330 does not authorize probation for a period of more than two years. Because of this, he claims that the circuit judge erred by placing him on probation until his eighteenth birthday. This argument is not persuasive because T.C. was not placed on probation until his eighteenth birthday; rather he was committed to the Division of Youth Services on August 15, 2008, with the condition that should he be released prior to his eighteenth birthday, he would be placed on probation from that point forward until his eighteenth birthday. Accordingly, there is no error on this point.

T.C. also maintains that the circuit judge erred by committing him to the Division of Youth Services and urges that the circuit judge failed to consider the best interests of the juvenile and the least restrictive alternative, as required by statute. Section 9–27–330(a)(1)(B) provides that "if a juvenile is found to be delinquent, the circuit court may ... based upon the best interest of the juvenile ... [c]ommit the juvenile to the Division of Youth Services." Despite T.C.'s argument to the contrary, the record reveals that the circuit judge considered T.C.'s best interests in determining his disposition. As an additional point, the circuit judge's decision was consistent with the recommendation from T.C.'s South Arkansas Youth Services counselor.

There was no error stemming from T.C.'s disposition.

Reversed and remanded. Court of Appeals reversed.

Special justices STUART W. HANKINS and AMY LEE STEWART join in this opinion.

CORBIN and WILLS, JJ., not participating.