Frank WILLIAMS, Jr. *v.* STATE of Arkansas

CR 93-988                                   902 S.W.2d 767

Supreme Court of Arkansas
Opinion delivered July 10, 1995

*Thomas A. Potter* and *Charles A. Potter*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kent G. Holt*, Asst. Att'y Gen., for appellee.

TOM GLAZE, Justice. On October 7, 1992, Clyde Spence, a farmer in Lafayette County, fired appellant Frank Williams, Jr. for breaking a tractor. Spence had employed Williams for several years, and had recently helped Williams obtain parole from prison under a work-release agreement. Before midnight that same night, Spence answered a knock at the door to his home. When the door opened, Spence's wife overheard Williams' voice. Mrs. Spence then heard two shots. She ran to the door and found her husband lying in the floor with blood coming out his ears. The Spences' son, Paul, who was spending the night, came running to the door, and Mrs. Spence informed Paul that Williams had shot Mr. Spence. Paul Spence called Captain John Bishop of the Arkansas State Police, and told Bishop that Williams had killed his father. Paul informed Bishop that his mother had heard Williams' voice. Bishop then called the radio dispatcher, telling him that Mrs. Spence had heard Williams' voice at the time of Mr. Spence's murder and that Williams was a suspect.

The police dispatcher subsequently notified Chief Deputy Peter Briggs that Spence had been killed and that someone had heard Williams' voice prior to the shooting.[1] Additionally, Captain Bishop told Deputy Briggs over the radio that Williams was apparently the assailant. Pursuant to information provided by Bishop and the dispatcher, Briggs found Williams, arrested him, and administered Williams his rights. Briggs performed a pat-down search of Williams which revealed the presence of a .25 automatic handgun in Williams' pocket. Knowing Williams was a parolee, Briggs realized Williams was violating the law by having a gun on his person. Subsequently, two .25 casings were found at the murder scene.

Williams was charged with breaking or entering, felon in possession of a firearm, theft of property, and the capital murder of Spence, but the felon in possession of a firearm charge was severed for a separate trial. Williams was tried by jury, and found guilty of capital murder and sentenced to death.

On appeal, Williams makes three arguments. First, Williams argues the seizure of the .25 pistol and his custodial statements should have been suppressed as fruits of an illegal arrest. Further, Williams argues his custodial statements should have been suppressed because the rights form he signed prior to giving his statements was defective. Finally, Williams argues testimony regarding his status as a work-release inmate had no independent relevance to any fact at issue, and thus, should have been suppressed. We find no merit with any of Williams' arguments.

■ In his initial argument, Williams contends his detention and arrest without a warrant were unlawful because the arresting officer did not have reasonable cause to believe Williams had committed a felony at the time he was arrested. *See* Ark. R. Crim. P. 4.1(a)(i). First, reasonable cause to arrest without a warrant does not require that degree of proof sufficient to sustain a conviction. *Ray* v. *State*, 304 Ark. 489, 803 S.W.2d 894 (1991).

---

[1]Although Williams attempts to rely upon an officer's statement that Captain Bishop said, "[T]he person (Mrs. Spence) at the house 'thought' they (sic) heard his (Williams') voice," other clear testimony was given that Williams' voice was the one heard.

This court has also held that reasonable cause to arrest without a warrant exists when the facts and circumstances within the officers' collective knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant in a man of reasonable caution the belief that an offense has been committed by the person to be arrested. *Roderick* v. *State*, 288 Ark. 360, 705 S.W.2d 433 (1986). *See also* Ark. R. Crim. P. 4.1(d). In sum, the officers, in arresting Williams, collectively were aware that Spence had been killed, that Williams' voice was heard at the time Spence was murdered, and that Williams was apparently the assailant.

Even if the foregoing facts lacked or fell short of reasonable cause, Williams' arrest was lawful under Ark. R. Crim. P. 3.1, which authorizes an officer to detain any person who he reasonably suspects has committed a felony. For purposes of this rule, reasonable suspicion means a suspicion based upon facts or circumstances which give rise to more than a bare, imaginary, or purely conjectural suspicion. *Ray*, 304 Ark. 489, 803 S.W.2d 894. In addition, if an officer who has detained a person under Rule 3.1 reasonably suspects that the detained person is armed and presently dangerous, the officer or someone designated by him may search the outer clothing of the detainee and seize a weapon or other dangerous thing which may be used against the officers or others. Ark. R. Crim. P. 3.4. Here, Briggs, the arresting officer, knew Williams was a murder suspect and a known felon. In detaining Williams, Briggs asked Williams if he had anything in his pocket, and Williams volunteered, "Yes, a pistol." Briggs then pulled a .25 automatic handgun from Williams' pocket. This court has held that evidence discovered as the fruit of a reasonable and lawful pat-down search is admissible. *Webb* v. *State*, 269 Ark. 415, 601 S.W.2d 848 (1980). In reviewing the totality of the circumstances, we conclude the trial court's finding that a valid warrantless search was performed was not clearly wrong. *See Ward* v. *State*, 308 Ark. 415, 827 S.W.2d 110 (1992). We conclude the facts here justified a lawful detention and subsequent search of Williams pursuant to Rules 3.1 and 3.4, and is yet a second reason why the trial court's denial of Williams' motion for suppression should be sustained.

We also mention a third reason why Williams' suppression argument should fail. At the time of his arrest, Williams was

known as a felon and parolee. He had executed an Act 309 inmate agreement whereby he was released from the penitentiary conditioned upon, among other things, the following:[2]

> 12. SEARCH. Inmate must submit your person, place of residence, and motor vehicles to search and seizure at any time, day or night, with or without a search warrant, whenever requested to do so by the supervisor or any law enforcement officer.

In *Cherry* v. *State*, 302 Ark. 462, 791 S.W.2d 354 (1990), the court upheld a warrantless search of Cherry, who, as a parolee, was subject to an agreement directing that his person, automobile, residence, or any property under his control could be searched by a parole officer without a warrant, if the officer had reasonable grounds for investigating whether Cherry had violated the terms of his parole or had committed a crime. Relying upon *Griffin* v. *Wisconsin*, 483 U.S. 868 (1987), the *Cherry* court pointed out that the supervision of probationers is a "special need" of the state, permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large. The court further concluded that the special needs of the parole process call for intensive supervision of the parolee, making the warrant requirement impractical. The court, however, stated that a parole/probation officer's ability to conduct a warrantless search is not unlimited and that such a search must be reasonably conducted.[3] Again, in this case, Officer Briggs was well aware Williams was a parolee, and that he had been implicated in Spence's murder. Obviously, such facts suggested reasonable grounds to investigate whether Williams had violated the terms of his parole, including whether he had violated the law and was improperly in possession of a firearm.

Williams' second point for reversal is that his two custodial statements were inadmissible because the "constitutional rights

[2]*See* Act 309 of 1983, codified as Ark. Code Ann. §§ 12-30-401–408 (1987 and Supp. 1993).

[3]We note that, in determining reasonableness in *Cherry*, the court had before it a slightly more narrowly worded parole agreement which limited the search to be done by a parole officer, while here Williams consented to search by his supervisor or any law enforcement officer.

form utilized by the officers failed to satisfy the requirements of *Miranda* v. *Arizona*, 384 U.S. 436 (1966)." He argues the rights form was deficient because of the following language:

> 3. You have the right to consult an attorney before answering any questions or making a statement, and you may have him present with you during questioning. Do you understand? _____

> 4. If you cannot afford an attorney *as determined by the Court* one will be appointed for you at no cost to you. Do you understand? _____

(Emphasis added.) Williams claims the two paragraphs, as read together, can reasonably be interpreted as linking an indigent's right to counsel before and during questioning to some point after questioning. Thus, Williams argues the form violates both the letter and spirit of *Miranda* and his custodial statements should have been suppressed.

In *Duckworth* v. *Eagan*, 492 U.S. 195 (1989), the Supreme Court addressed a similarly worded rights form and held that, based on the totality of the form, the warnings reasonably conveyed to the defendant his rights as required by *Miranda*. There, the relevant portion of the form provided the following:

> You have a right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning. You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. We have no way of giving you a lawyer, but one will be appointed for you, if you wish, *if and when you go to court.*

*Id.* at 198. (Emphasis in the original with other emphasis omitted.) In finding the *Duckworth* form met constitutional muster, the Court distinguished *California* v. *Prysock*, 453 U.S. 355 (1981), where the Court had "suggested that *Miranda* warnings would not be sufficient 'if the reference to the right to appointed counsel was linked [to a] future point in time *after* the police interrogation.'" *Duckworth* at 194. (Emphasis in original, citation omitted.)

The *Duckworth* court found the lower court had "misap-

prehended the effect of the inclusion of 'if and when you go to court' language." First, the inclusion accurately described Indiana's procedure for the appointment of counsel. Second, *Miranda* does not require that attorneys be "on call" for immediate appointment, but only that a suspect be informed that he has a right to counsel before and during questioning, and that an attorney will be appointed if the suspect cannot afford one. *Id.*

In Arkansas, as in Indiana, attorneys are appointed by the court upon a showing of indigency. *See* Ark. R. Crim. P. 8.2(a). Thus, paragraph 4 of the forms, as read to and signed by Williams, accurately reflects the fact that the court will determine indigency before appointing counsel.

■ Concerning this rights-form issue, we also conclude that, viewed in their totality, the warnings contained in the forms reasonably conveyed to Williams his rights as required by *Miranda*, namely, that he had the right to remain silent, that anything he said could be used against him in a court of law, that he had the right to the presence of an attorney, and that if he could not afford an attorney, one would be appointed for him prior to any questioning, if he so desired. Specifically, paragraphs 1, 4 and 5 informed Williams that he could remain silent and that an attorney would be appointed at no cost to him, but if he decided to answer any questions or make a statement, he had the right to stop at any time and consult with an attorney. As the Court in *Duckworth* stated, "the prophylactic *Miranda* warnings are not themselves rights protected by the Constitution." *Duckworth* at 203. Warnings that are the "fully effective equivalent" of *Miranda* will insure that the right against compulsory self-incrimination is protected. *Id.* We hold that the warnings given to Williams here were equivalent to those articulated and required by *Miranda*.

■■ Before leaving this issue, we also address Williams' comment that his two signed statements did not contain everything he had said during his interviews with Officer Briggs. Suffice it to say, Officer Briggs testified that he had "put in" everything Williams said although he did not include all the questions asked of him. When testimony on the circumstances surrounding the taking of a custodial confession is conflicting, it is the trial court's province to weigh the evidence and resolve the credibility of the witnesses. *Noble* v. *State*, 319 Ark. 407, 892 S.W.2d

477 (1995). Here, Williams had the opportunity to read his statements and refuse to sign them. Instead, he signed both of them.

In his third argument, Williams asserts the trial court erred in allowing the prosecutor and witnesses to refer to the fact he was on parole and in a work-release program at the time of the murder. He claims his past record has no probative relevance in this matter, and even if it did, the probative value of the evidence was substantially outweighed by its prejudicial nature.

The state's case against Williams was largely based upon the fact that Williams killed Spence because Spence had fired him. Spence had employed Williams in past years, and had arranged recently for Williams to work for him while Williams was participating in the work-lease program. Williams had told his girlfriend that if he lost his job with Spence, he would have to go back to prison or find another job. The state's theory was that Williams' motive for killing Spence was one of revenge. The trial court agreed with the prosecutor that the evidence was admissible to show Williams' motive, and we believe the trial court was correct in so ruling. *See Carter* v. *State*, 295 Ark. 218, 748 S.W.2d 127 (1988). We also mention that, after the trial court ruled such testimony and evidence was admissible, the state agreed to accept an admonishment to the jury that Williams' work-release status be considered going only to show Williams' motive for the murder and for no other purpose, but Williams never requested such an instruction. As a consequence, no reversible error has been demonstrated. *Woodruff* v. *State*, 313 Ark. 585, 856 S.W.2d 299 (1993).

The state has asked this court to conduct a proportionality review which we have done in the past. *See Sanders* v. *State*, 317 Ark. 328, 878 S.W.2d 391 (1994); *Parker* v. *State*, 300 Ark. 360, 779 S.W.2d 156 (1989); *Hill* v. *State*, 289 Ark. 387, 711 S.W.2d 479 (1986). Comparative proportionality review is not constitutionally mandated in every case where the death sentence is imposed. *Pulley* v. *Harris*, 465 U.S. 37 (1984). Our Legislature, by enacting recent sentencing procedures, has provided a statutory check on arbitrariness by requiring a bifurcated proceeding where the jury is provided with information on aggravating and mitigating circumstances, and with standards in the use of that information. *See* Ark. Code Ann. §§ 5-4-103, 5-4-603–605 (Repl.

1993). Additionally, our review upon appeal includes a review of the aggravating and mitigating circumstances presented to the jury and a harmless error review of the jury's findings. *See* § 5-4-603.

In the present case, the jury unanimously found one aggravating circumstance existed beyond a reasonable doubt, namely, Williams had previously committed another felony, an element of which was the use or threat of violence to another person or creating a substantial risk of death or serious physical injury to another person. *See* Ark. Code Ann. § 5-4-604(3) (Repl. 1993). The previously committed felony involved circumstances in which Williams threatened a law enforcement officer with a butcher knife, and was the offense for which Williams was currently on parole. In that encounter, Williams pointed an eight-inch knife towards the officer. In recalling the event, the officer said that if he had not moved away from Williams, Williams would have "cut me up and spit me out." The officer recounted that Williams threw down the knife only after the officer drew his revolver. As to mitigating circumstances, Williams offered testimony regarding his deprived socioeconomic background and his dysfunctional family, and expert testimony that he was under the influence of alcohol and marijuana at the time of the murder. A unanimous jury found no mitigating circumstances probably existed at the time of the murder. We find no error.

The record has been examined pursuant to Ark. Sup. Ct. R. 4-3(h), and there is no error that has been identified that would warrant reversal. Therefore, we affirm.