Kirk Edward OTIS *v.* STATE of Arkansas

CR 04-1323 217 S.W.3d 839

Supreme Court of Arkansas
Opinion delivered November 17, 2005

154

156

*Teri Chambers*, Arkansas Public Defender Comm'n, for appellant.

*Steven A. Drizin, amicus* on behalf of appellant.

*Mike Beebe*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.

TOM GLAZE, Justice. Appellant Kirk Otis was charged with capital murder for shooting and killing Barney Smith. Otis, who was fourteen years old at the time, was convicted of manslaughter and sentenced to ten years' imprisonment. On appeal, Otis does not challenge the sufficiency of the evidence supporting his conviction; rather, he urges that the trial court erred 1) in denying his suppression motions, and 2) in allowing the State to display a large photo of the victim to the jury during the course of the trial. We find no error and affirm.

Prior to trial, Otis filed several motions seeking to suppress various statements he gave to investigating officers. Evidence taken at the suppression hearing revealed the following: During the course of investigating the death of Barney Smith, police officers received a phone call from Tamara Thomas, who had heard that a person nicknamed "Oonie Pig" may have been involved in the shooting. Agent R.L. Newton of the Arkansas State Police discovered that "Oonie Pig" lived at a certain address in Stuttgart, so Newton, along with Agents Ken Whitmore and David Chastain of the Arkansas State Police, went to that address during the early evening hours of July 25, 2001. Newton then knocked on the door, and Otis's grandmother, Catherine Geans, answered. Newton asked to speak to Otis. When Otis came to the door, Newton advised Otis that he was not a suspect and was not under arrest, but the police wanted to interview him to see if he had any information about the murder. According to Newton's testimony, Geans looked at Otis and asked him whether he wanted to go with the officers; Otis replied that he would.

Newton testified that he asked Otis if he would voluntarily come with the officers so they could talk to him, telling him that it would probably take ten or fifteen minutes, after which the police would bring him back home. Newton said that, at that point, Otis was not considered a suspect; the officers thought the tip about "Oonie Pig" was "just another lead we were running out."

The officers transported Otis to the police station in an unmarked vehicle. Once there, Newton asked Otis where he had been the night of July 20, 2001, the night Smith was shot. Otis, who was fourteen years old at the time, first replied that he had been at his grandmother's house, but then he changed his story and

said that he had been at his cousin's. When Newton asked whether Otis knew anything about the man who had been robbed and killed on Fifth Street, Otis paused a moment, then hung his head and said, "I did it. I was drunk." Newton immediately stopped questioning Otis and called the prosecuting attorney, who advised Newton to read Otis his *Miranda* rights.

Agent Whitmore advised Otis of his *Miranda* rights at approximately 9:00 p.m. on July 25, 2001. According to Whitmore, Otis appeared to understand those rights and agreed to give a statement. In this statement Otis claimed that his cousin, Lloyd O'Neal, had done the shooting and that he (Otis) had unwittingly acted as a lookout.

At this point, the officers determined that they should call Otis's grandmother Geans and ask her to come to the station. After Geans arrived, along with Otis's mother and step-father, Newton tape-recorded a third statement, beginning at 12:40 a.m. on July 26, 2001, in which he asked Otis leading, yes-or-no questions about what had happened since the police officers picked Otis up at his grandmother's house.

At 12:50 a.m. that same morning, Agent Whitmore again advised Otis of his *Miranda* rights and took another tape-recorded statement, in which Otis repeated his story that his cousin had committed the robbery and shooting; Otis denied that he had been involved. After giving this fourth statement, Otis accompanied police officers as they went to look for the murder weapon. They returned to the police station between 2:00 and 2:30 a.m. on July 26, 2001, and Otis was taken to the juvenile detention facility early that same morning.

Otis was also given a polygraph examination on July 26, 2001, by Arkansas State Police polygraph examiner Charles Beall. Prior to the examination, Beall read Otis his *Miranda* rights about 9:26 p.m. During the pre-test interview, Otis told Beall that he was not involved in any way in the death of Barney Smith. During the polygraph examination, Otis again denied being involved. After the test, Beall took a tape-recorded statement from Otis, but this time, Otis confessed to having shot Smith.

After taking the polygraph examination, Otis was returned to the juvenile detention facility. When he arrived, he encountered juvenile intake officer Doug Manchester. Manchester testified that Otis was "upset and crying," and said to Manchester, "Mr. Doug, I told the truth."

Otis was again taken out to look for evidence during the early morning hours of July 27, 2001. Arkansas State Police Agent Charles McLemore was assigned to take Otis back to the sheriff's office. At approximately 1:30 a.m. on July 27, as the two were returning to the sheriff's office, Otis asked McLemore if he could ask a couple of questions. Before McLemore could respond, Otis said, "Sir, that wasn't me that killed that man." Otis then stated, "If I had not been drinking gin, I would never have done that." Otis then related to McLemore that he (Otis) had gone up on Smith's porch with a gun in his hand. Smith made a derogatory racial comment to him, and Otis, who had cocked the gun, said he did not know what happened, but that the hammer slid forward.

The last statement at issue occurred at the juvenile detention facility; Jackie Wilson, an employee of the facility, testified that Otis called Wilson to his cell, and said that he did not know what the judge was going to do to him. Otis also told Wilson that he had gotten the gun in order to go target shooting with his father, but his father did not show up. Otis also claimed to have been drinking that day; he told Wilson that he was on his way home and went through Smith's yard. When he asked Smith for some money, Smith used a racial epithet and told him to get out of his yard. This made Otis angry, Otis told Wilson, so he pulled out the gun and pulled back the hammer, and the gun went off.

Having considered the pertinent evidence needed to address his motions to suppress, Otis raises four separate arguments to show that the trial court erred when it denied his motions. In his first subpoint on appeal, Otis argues that the trial court erred in finding that the police did not violate Ark. R. Crim. P. 2.2 and 2.3 and Ark. Const. art. 2, § 15. Here, he relies on this court's decision in *State v. Brown*, 356 Ark. 460, 156 S.W.3d 722 (2004), in which this court held that police officers must inform a suspect that he or she has the right to refuse to consent to the officers' request to conduct a search of the suspect's home. *Brown*, however, is inapplicable to the facts of this case.

In *Brown*, this court was specifically concerned with warrantless entries into the *home*. In addressing the propriety of "knock-and-talk" searches, this court held that, in order for a warrantless, consent-based search of a home to be valid, the investigating officers must inform the suspect that he or she has the right to refuse to consent to that search. *Brown*, 356 Ark. at 472-73. In so doing, this court emphasized Arkansas's "constitutional history and preexisting state law regarding the privacy rights of a

home dweller in his or her home[.]" *Id.* at 470. Nothing in the text of the opinion indicates that it was intended to be applied to situations involving requests for individuals to accompany police officers to the police station in order to assist with an investigation.

Rather, the appropriate inquiry is under Ark. R. Crim. P. 2.2, which permits an officer to ask a person to appear at the police station, so long as the officer does not indicate that a person is legally obligated to furnish information or to otherwise cooperate, and Ark. R. Crim. P. 2.3, which provides that a law enforcement officer asking an individual to come to the police station must "take such steps as are reasonable to make clear that there is no legal obligation to comply with such a request." Otis concedes that there was some testimony indicating that Newton informed Otis that he did not have to accompany the officers to the police station. As such, the trial court did not err in concluding the officers did not violate Rule 2.3. *See Winston v. State,* 355 Ark. 11, 131 S.W.3d 333 (2003) (resolving issues concerning the credibility of witnesses is within the province of the trial court).

However, Otis argues briefly that the officers violated Rule 2.2 by failing to inform him that he was under no legal obligation to talk to the police. However, the trial court made no ruling with respect to whether the officers violated Rule 2.2, finding only that the officers did not violate Rule 2.3. Otis failed to preserve his argument concerning Rule 2.2. *See, e.g., Standridge v. State,* 357 Ark. 105, 161 S.W.3d 815 (2004) (it is incumbent upon an appellant to obtain a ruling from the trial court in order to preserve an argument for appeal).

Otis next argues that the trial court erred in finding that he intelligently and voluntarily waived his *Miranda* rights. In order to determine whether a waiver of *Miranda* rights is voluntary, knowing, and intelligent, this court looks to see if the statement was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Flowers v. State,* 362 Ark. 193, 208 S.W.3d 113 (2005); *Jordan v. State,* 356 Ark. 248, 147 S.W.3d 691 (2004). In other words, the relevant inquiry is whether Otis waived his rights with "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Conner v. State,* 334 Ark. 457, 982 S.W.2d 655 (1998); *Sanford v. State,* 331 Ark. 334, 346, 962 S.W.2d 335, 341–42 (1998). In order to make this determination, this court reviews the

totality of the circumstances surrounding the waiver including the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; the use of mental or physical punishment; and statements made by the interrogating officers and the vulnerability of the defendant. *Jordan, supra.* This court will reverse a trial court's ruling on this issue only if it is clearly against the preponderance of the evidence. *Grillot v. State,* 353 Ark. 294, 107 S.W.3d 136 (2003). The credibility of witnesses who testify at a suppression hearing about the circumstances surrounding the appellant's in-custody confession is for the trial judge to determine, and we defer to the superior position of the trial judge in matters of credibility. *Jones v. State,* 344 Ark. 682, 42 S.W.3d 536 (2001).

■ Consideration of the validity of a criminal defendant's waiver of the right to remain silent and the right to counsel prior to giving an inculpatory statement may be divided into two components. *See Clay v. State,* 318 Ark. 122, 883 S.W.2d 822 (1994); *Bryant v. State,* 314 Ark. 130, 862 S.W.2d 215 (1990). The first component is the voluntariness of the waiver, and it concerns whether the accused has made a free choice, uncoerced by the police, to waive his rights. *Clay,* 318 Ark. at 129 (citing *Mauppin v. State,* 309 Ark. 235, 831 S.W.2d 102 (1992)). The second component involves whether the defendant made the waiver knowingly and intelligently, and the inquiry then focuses on determining if the waiver was made with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

■ A statement is voluntary if it is the product of a free and deliberate choice, rather than intimidation, coercion, or deception. *Conner,* 334 Ark. at 467. In assessing the voluntariness of a waiver of one's *Miranda* rights, the court considers, in addition to the age, education, and intelligence of the accused, the statements made by interrogating officers and the vulnerability of the defendant. *Id.* Further, while age and mental capacity are factors to be considered, they alone do not suffice to warrant the suppression of a confession. *See Diemer v. State,* 340 Ark. 223, 9 S.W.3d 490 (2000); *Wright v. State,* 335 Ark. 395, 983 S.W.2d 397 (1998).

On appeal, Otis argues that he was fourteen years old at the time he gave his statements and was mildly mentally retarded. He

asserts that he was "accosted" by numerous law enforcement officers at his home; he was initially questioned without having been given his *Miranda* warnings; he was repeatedly questioned over three separate occasions during the evening and early morning hours of July 25-26, 2001; Officer Whitmore, who conducted most of the questioning, was physically much larger than Otis; and Otis was questioned for hours without his mother being allowed in the room. Thus, he claims, his waiver was not voluntary, but was the result of intimidation.

As noted above, the fact that a defendant is young or has a low IQ does not mean that a suspect is incapable of knowingly and intelligently waiving his *Miranda* rights. In *Sanford v. State*, 331 Ark. 334, 962 S.W.2d 335 (1998), this court held that Damond Sanford, a sixteen-year-old boy with a full-scale IQ of 67, had knowingly waived his rights when there was testimony that he understood the statements on the waiver form, as well as evidence that Sanford appeared to understand his rights and did not ask officers any questions about the form. *Sanford*, 331 Ark. at 347. The *Sanford* court also noted that Sanford's father was present during the execution of the waiver forms. *Id.* Given the totality of the circumstances, the court held that the trial court did not err when it found that Sanford had knowingly and intelligently waived his *Miranda* rights.

Likewise, in *Oliver v. State*, 322 Ark. 8, 907 S.W.2d 706 (1995), this court held that youth and a low IQ would not render a waiver of rights involuntary where the evidence showed that the waiver was knowing and voluntary. There, appellant Timothy Oliver was fifteen years old at the time of his arrest and had an IQ of 74; there was testimony that he had the "mental age of a twelve-year-old." *Oliver*, 322 Ark. at 17. Nonetheless, this court noted testimony from the suppression hearing that the arresting officers had explained the waiver-of-rights form to Oliver, and that Oliver appeared to understand the form. *Id. See also Hill v. State*, 344 Ark. 216, 40 S.W.3d 751 (2001) (sixteen-year-old with an IQ of 89 and the reading comprehension of a fifth-grader capable of knowingly and intelligently waiving his *Miranda* rights); *Misskelley v. State*, 323 Ark. 449, 915 S.W.2d 702 (1996) (seventeen-year-old with an IQ of 72 and a third-grade reading level found to have given a knowing and intelligent waiver; the court held that "[a] low score on an intelligence quotient test does

not mean that a suspect is incapable of voluntarily making a confession or waiving his rights").

 Here, Otis was fourteen years old and was a seventh-grade drop-out. Dr. Christopher Lamps, a child and adolescent psychiatrist, testified that Otis had a functional full-scale IQ of 68 or 69 and had a functional age of nine to twelve years old. However, Agent Newton, who first questioned Otis, testified that he was unaware that Otis was "mentally slow." Similarly, Agent Beall, who conducted the polygraph examination, testified that he had a mentally retarded child, and was accustomed to interviewing mentally handicapped juveniles, yet he did not perceive that Otis was mentally handicapped. Beall also commented that Otis was able to respond to all of Beall's questions, and Beall was convinced that Otis understood what they were doing. Agent Whitmore testified that, although he "detected right off the bat" that Otis was "slow," when he read the *Miranda* warnings to Otis, Whitmore was careful to explain what the words on the form meant and repeatedly asked Otis whether he understood what he was reading; Otis responded that he did. In addition, Whitmore noted that, after he explained to Otis the meaning of several words on the rights form, Otis did not have any questions. Further, we note that Otis's mother was present when Otis signed the *Miranda* waiver form at 12:50 a.m. on July 26. Given the testimony before it, the trial court did not err in concluding that, under the totality of the circumstances, Otis's signing of the *Miranda* waiver form was free from coercion and with a full awareness of the nature of the right being waived and the consequences of the decision to abandon it.[1]

---

[1] Although it is not raised or argued by either party, we also point out that Otis's spontaneous confessions to Agent McLemore and Jackie Wilson were properly admitted. This court has held that it is "well settled that a suspect's spontaneous statement, although made in police custody, is admissible against him or her." *Arnett v. State*, 353 Ark. 165, 122 S.W.3d 484 (2003) (holding that a confession made in response to a police officer's asking, "What's up?" was admissible because it was not made in the context of a police interrogation). Such a statement is admissible "because it is not compelled or the result of coercion under the Fifth Amendment's privilege against self-incrimination." *Id.* at 172. *See also State v. Pittman*, 360 Ark. 273, 200 S.W.3d 893 (2005) (citing *Rhode Island v. Innis*, 446 U.S. 291 (1980). Otis's statements to McLemore and Wilson were purely spontaneous and were not the result of an interrogation or any kind of police coercion. Therefore, the trial court did not err in denying Otis's motion to suppress these statements.

Otis's third argument pertaining to his motion to suppress is that the trial court erred in finding that the officers did not violate Ark. R. Crim. P. 4.1. Rule 4.1, governing arrests without a warrant, provides in relevant part as follows:

> A person arrested without a warrant shall not be held in custody unless a judicial officer determines, from affidavit, recorded testimony, or other information, that there is reasonable cause to believe that the person has committed an offense. Such reasonable cause determination shall be made promptly, but in no event longer than forty-eight (48) hours from the time of arrest, unless the prosecuting attorney demonstrates that a bona fide emergency or other extraordinary circumstance justifies a delay longer than forty-eight (48) hours. Such reasonable cause determination may be made at the first appearance of the arrested person pursuant to Rule 8.1.

Rule 4.1(e).

Otis argues that there was an unreasonable delay in the probable cause determination, because he was arrested without a warrant, yet was held in custody from 9:00 p.m. on July 25, 2001, until the prosecuting attorney filed a criminal information, accompanied by a bench warrant and finding of probable cause signed by a district judge, at 4:02 p.m. on July 27, 2001. Otis further argues that a probable cause determination could have been made as early as 1:20 a.m. on July 26, 2001, when Agent Newton obtained a search warrant for the residence of Lloyd O'Neal, whom Otis had implicated in the shooting. He suggests that the delay in determining probable cause was occasioned by a desire to uncover additional evidence to support the arrest, and for that reason, the delay was unreasonable. *See County of Riverside v. McLaughlin*, 500 U.S. 44 (1991).

■■ This court has held that Rule 4.1 is mandatory and requires that an arrestee be taken before a judicial officer for a reasonable cause determination within forty-eight hours of arrest. *See Britt v. State*, 344 Ark. 13, 38 S.W.3d 363 (2001) (citing *County of Riverside v. McLaughlin, supra*). In *McLaughlin*, the Supreme Court held that, while "a jurisdiction that provides judicial determination of probable cause within forty-eight hours of arrest will, as a general matter, comply with the promptness requirements of *Gerstein* [*v. Pugh*, 420 U.S. 103 (1975)]," it does not automatically follow that a probable cause determination will pass constitutional muster simply because it is provided within forty-eight hours. *McLaughlin*, 500 U.S. at 56. The Court wrote as follows:

Such a hearing may nonetheless violate *Gerstein* if the arrested individual can prove that his or her probable cause determination was delayed unreasonably. Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake. In evaluating whether the delay in a particular case is unreasonable, however, courts must allow a substantial degree of flexibility. Courts cannot ignore the often unavoidable delays in transporting arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest, and other practical realities.

*Id.* at 56-57.

A probable cause determination was made in this case within forty-eight hours, as required by Rule 4.1. Nonetheless, Otis argues that the determination was unreasonably delayed due to the investigating officers' desire to find more evidence. However, as noted above, the *McLaughlin* court condemned as unreasonable a search for additional evidence only when the evidence is being sought in order to *justify* the arrest. Here, because Otis confessed to the shooting shortly after being brought to the police station, the officers already had a sufficient amount of evidence to justify his arrest. As such, there was no unreasonable delay and no violation of Rule 4.1.

Otis's final argument regarding the trial court's denial of his motion to suppress is that the trial court erred in finding that the officers did not violate Ark. R. Crim. P. 8.1. Rule 8.1 provides that "[a]n arrested person who is not released by citation or by other lawful manner shall be taken before a judicial officer without unnecessary delay." Otis was arrested on Wednesday, July 25, 2001, but was not taken before a judicial officer for his first appearance until Monday, July 30. He asserts that the only reason for the delay in his first appearance was the State's ongoing investigation into the murder.

This Court has never adopted a specific time limit for measuring Rule 8.1 violations. *Arnett v. State*, 342 Ark. 66, 27 S.W.3d 721 (2000); *Landrum v. State*, 328 Ark. 361, 944 S.W.2d 101 (1997) (citing *Duncan v. State*, 291 Ark. 521, 726 S.W.2d 653 (1987)). Instead, when Rule 8.1 is alleged to have been violated,

the court in *Duncan* set out a three-part test to determine whether a statement given during a period of delay must be suppressed: 1) whether the delay was unnecessary; 2) whether the resulting evidence was prejudicial; and 3) whether the resulting evidence was reasonably related to the delay. *Duncan*, 291 Ark. at 529; *see also Britt v. State*, 334 Ark. 14, 974 S.W.2d 435 (1998). The defendant has the burden of proving each prong of the *Duncan* test. *Arnett*, 342 Ark. at 75.

■ Clearly, the statements Otis gave during the period of delay were prejudicial, as he implicated himself in the Smith murder. However, he must also prove that the delay was unnecessary and that the resulting evidence was reasonably related to the delay. Otis argues that the delay was unnecessary because the circuit court was in session, conducting a civil trial, on Thursday, July 26, 2001. However, the State points out that, on July 26, Otis had asked to be administered a polygraph test, and the State was attempting to bring in a polygraph examiner at that time. Thus, the delay on July 26 was a result of Otis's own request, and was not an unreasonable delay occasioned by the State.

■ In addition, Otis must also prove that his statements were reasonably related to the delay. This court has stated that statements are reasonably related to a delay "if it reasonably appears the delay contributed to obtaining the confession." *Arnett*, 342 Ark. at 76; *Britt*, 334 Ark. at 155 (quoting *Duncan*, 291 Ark. at 530, 726 S.W.2d at 657). In determining whether a statement obtained from the accused was reasonably related to the delay, this court will consider the following factors: 1) any proof that the delay was for the purpose of obtaining a confession; 2) the frequency of police interrogation; 3) whether the accused was held incommunicado; and 4) the passage of time. *Arnett*, 342 Ark. at 76.

■ Otis argues that his statements were causally related to the delay, because it is "unlikely" that, had he been appointed counsel by a judge at a first appearance held on July 26, he would have made any of the statements he gave after July 26. However, as noted above, it was not unreasonable to have not afforded him a first appearance on July 26. He makes no argument that he could have had his first appearance on Friday, July 27, and by that time, he had already confessed to the murders. Thus, there was no proof that the delay was for the purpose of obtaining a confession. In addition, although the police questioned him several times after

arresting him, there was testimony that his grandmother, mother, and step-father were present at the police station, and that Otis sat with them part of the time; he was not held incommunicado. In sum, we cannot say that the trial court erred in finding that there had been no violation of Rule 8.1.

In his second major point on appeal, Otis argues that the trial court erred in allowing the State to display and admit into evidence a plaque depicting the victim in his military uniform and describing his military career. During Otis's opening statement, the prosecuting attorney placed a plaque containing a picture of the victim, Barney Smith, in a chair at counsel table. Otis objected, noting that the picture had not been admitted into evidence. The State replied that it "just want[ed] to make sure [the jurors] realize this is about two people, not just Kirk Otis." The State then turned the photo around so it faced the bench. Otis later renewed his objection and moved for mistrial, contending that the photo was still sitting at counsel table, although it had not been introduced into evidence. The trial court denied the motion.

On appeal, Otis argues that it was improper to display an item to the jury if it has not been admitted into evidence. *See Johnson v. State*, 249 Ark. 208, 458 S.W.2d 409 (1970) (declining to condone the practice of displaying exhibits to the jury prior to admission into evidence). He acknowledges that the trial court has the discretion to determine the relevancy of evidence and its admissibility, and that this court will not overturn such a decision absent a clear abuse of that discretion. *See Dyer v. State*, 343 Ark. 422, 36 S.W.3d 724 (2001).

We conclude that, while we do not condone the display of the plaque, any error that may have resulted from the displaying of the plaque was harmless. *See Barrett v. State*, 354 Ark. 187, 119 S.W.3d 485 (2003) (even when a trial court errs in admitting evidence, when the evidence of guilt is overwhelming and the error is slight, we can declare that the error was harmless and affirm the conviction); *Cobb v. State*, 340 Ark. 240, 12 S.W.3d 395 (2000) (any error in admitting allegedly irrelevant testimony that the defendant loved music was harmless where the defendant admitted killing the victim and evidence supported the conviction). Here, the evidence of Otis's guilt, in the form of his properly admitted confessions, was overwhelming, so any error that may have arisen from the introduction of the plaque was harmless.