Bradley Ray WILSON *v.* STATE of Arkansas

CA CR 05-1013                          237 S.W.3d 473

Court of Appeals of Arkansas
Opinion delivered June 21, 2006

*Stanley D. Christopher*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Nicana Corinne Sherman*, Ass't Att'y Gen., for appellee.

OLLY NEAL, Judge. On February 14, 2005, appellant Bradley Wilson entered a conditional plea of guilty admitting guilt to two counts of residential burglary, one count of theft of property valued in excess of $2500, and one count of theft of property valued in excess of $500. Appellant also admitted that he was a habitual offender with two or more felonies. He was sentenced to serve fifty years in the Arkansas Department of Correction. Pursuant to Rule 24.3 of the Arkansas Rules of Criminal Procedure, appellant preserved his right to appeal the trial court's denial of his motions to suppress the evidence against him. On appeal, appellant argues that the trial court erred in denying his motion to suppress evidence obtained as a result of involuntary statements made by appellant after he was informed that he was not entitled to an attorney. He also argues that the trial court erred in denying his motion to suppress evidence obtained as a product of involuntary statements made by appellant based upon false promises of leniency by law enforcement personnel. We affirm.

The facts of this case are as follows. On August 17, 2004, the Saline County Sheriff's Department took appellant into custody for a parole violation. While in custody, appellant was advised of his *Miranda* rights and he signed a consent form. A detective attempted to interview appellant; however, appellant refused to speak to the detective until after the tape in the detective's recorder ran out. Appellant then indicated that he had knowledge

concerning several burglaries that had occurred in Grant, Pulaski, and Saline Counties. Appellant indicated that he would cooperate in exchange for a deal.

The detective arranged a meeting for the following day with John McQuary, who was Saline County chief deputy prosecutor at the time. Appellant's mother, Shirley Beard, and two detectives were also present at the meeting. During the meeting, McQuary informed appellant that he would not make any deals or promises but that he would take into consideration any help appellant could provide in recovering the stolen property. McQuary also indicated that he would inform the Grant and Pulaski County prosecuting attorneys that appellant was cooperating. When McQuary refused to put an agreement in writing, Ms. Beard inquired about obtaining an attorney for appellant. In response to Ms. Beard's inquiry, McQuary allegedly replied that appellant had yet to be charged with anything and that appellant could not be appointed an attorney until after he was charged. Thereafter, appellant assisted all three counties with their resulting burglary investigations.

Appellant pleaded guilty to burglary charges in both Pulaski and Saline counties. On September 27, 2004, appellant was charged, in Grant County, with two counts of residential burglary, theft of property with a value in excess of $2500, theft of property with a value in excess of $500, and being a habitual offender with two or more felonies. Appellant moved to suppress the evidence against him. He argued that the trial court should suppress any evidence that was obtained as a result of involuntary statements made after promises of leniency. Appellant also argued that the trial court should suppress any evidence that was obtained as a result of involuntary statements made after he was informed that he was not entitled to an attorney. The trial court denied appellant's motion, finding that appellant never invoked his right to counsel and that appellant was in no way coerced by promises of leniency. From that decision, appellant now brings this appeal.

In reviewing a trial court's denial of a motion to suppress evidence, we conduct a de novo review based on the totality of the circumstances, reviewing findings of historical fact for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the trial court. *Swan v. State*, 94 Ark. App. 115, 226 S.W.3d 6 (2006). The credibility of witnesses who testify at a suppression hearing about the circumstances surrounding the appellant's custodial statement is for the trial judge to determine, and we defer to

the superior position of the trial judge in matters of credibility. *See Otis v. State*, 364 Ark. 151, 217 S.W.3d 839 (2005).

In his first argument on appeal, appellant asserts that the trial court erred when it failed to suppress evidence obtained as a result of involuntary statements made by appellant after being informed that he was not entitled to an attorney. A custodial statement is presumptively involuntary; it is the State's burden to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made. *Knight v. State*, 62 Ark. App. 230, 971 S.W.2d 272 (1998). In determining whether a statement is voluntary, the reviewing court makes an independent review of the totality of the circumstances and will not reverse unless the trial court's findings are clearly against the preponderance of the evidence. *Stephens v. State*, 328 Ark. 81, 941 S.W.2d 411 (1997). There are two components to the totality of the circumstances test for determining the voluntariness of a custodial statement. *Id.* First, the statements of the interrogating officers are examined. *Id.* Second, the vulnerability of the defendant is considered, weighing such factors as age, education, intelligence, repeated or prolonged nature of questioning, delay between receiving *Miranda* warnings and giving a confession, length of detention, use of physical punishment, and the defendant's physical and emotional condition. *Id.*

In the case at bar, the testimony at the suppression hearing established the following. Detective Randy Gibbons of the Saline County Sheriff's Department testified that appellant was taken into custody on August 17, 2004. He said that appellant was informed of his *Miranda* rights and that appellant signed a consent form. While attempting to interview appellant, Detective Gibbons learned that appellant was a suspect in several burglaries. When appellant indicated that he wanted a deal in exchange for his cooperation, Detective Gibbons arranged for appellant to meet with McQuary. Detective Gibbon testified that, during his interview with appellant, appellant never asked for an attorney. He recalled that, during the meeting with McQuary, appellant's mother requested an attorney on his behalf and that McQuary informed them that "when he was charged with anything he would go to court and he could be appointed an attorney or she could get him an attorney if he wanted an attorney."

Shirley Beard, appellant's mother, testified that, during the meeting with McQuary, she requested an attorney for her son. She

said that McQuary informed her that appellant had not been charged with anything and that he could not get an attorney appointed until after he was charged.

Appellant testified that, during his lifetime, he had been interviewed by the police approximately four to six times and that, as a result, he had signed *Miranda* warnings four to six times. He stated that he basically understood his *Miranda* rights. Appellant also testified that he had been to prison three times. Appellant said that he asked Detective Gibbons for an attorney during the first three days of his being taken into custody. He said that, during the meeting with McQuary, his mother requested an attorney for him. He said that they were told he could not have an attorney because he had yet to be charged with anything.

John McQuary testified that, in August 2004, he was the Chief Deputy Prosecuting Attorney for Saline County. He recalled meeting with appellant and Ms. Beard on August 18. He said that, at the time, appellant was being held on a parole hold and that appellant had not been arrested on any breaking or entering charges. During his testimony, McQuary stated:

> I do not remember his mother requesting an attorney at all. I remember speaking to his mother after we had spoken with [appellant]. This was outside. And I don't remember the full conversation at all on it. But I do know I do not remember her requesting an attorney for her son at all. Number one, it would have caused me enough hesitancy that I think that I would have remembered that even though she's not the one that would need to request an attorney in that situation.

He stated that, during the meeting, appellant did not appear to have any mental infirmities that would keep him from making decisions regarding his own welfare.

We conclude that, although appellant testified that he first requested an attorney during the first couple of days of his being taken into custody, the trial court was not required to believe appellant's testimony. It has been said on numerous occasions that the trial judge is not required to believe the testimony of any witness, particularly that of the accused since he or she is the person most interested in the outcome of the proceedings. *Bunch v. State*, 346 Ark. 33, 57 S.W.3d 124 (2001).

As to what occurred during the meeting with McQuary, Ms. Beard and McQuary gave conflicting testimony regarding whether

or not Ms. Beard asked for an attorney on her son's behalf. The trial court found that appellant never personally invoked his right to counsel. It is well settled that we defer to the credibility determinations made by the trial judge. *See Swan v. State, supra.* Furthermore, the right to an attorney is a personal right. *Scott v. State,* 298 Ark. 214, 766 S.W.2d 428 (1989); *Suire v. State,* 18 Ark. App. 166, 712 S.W.2d 317 (1986). A third party may not invoke a defendant's personal right to an attorney. *See U.S. v. Scarpa,* 897 F.2d 63 (2d Cir. 1990) (holding that once a defendant waived his constitutional rights, those rights could not be invoked by a third party).

Appellant also argues that the trial court erred when it failed to suppress evidence obtained that was the result of involuntary statements made by appellant following false promises of leniency. A statement induced by a false promise of reward or leniency is not a voluntary statement. *Pilcher v. State,* 355 Ark. 369, 136 S.W.3d 766 (2003). When a police officer makes a false promise that misleads a prisoner, and the prisoner gives a confession because of that false promise, then the confession has not been made voluntarily, knowingly, and intelligently. *Roberts v. State,* 352 Ark. 489, 102 S.W.3d 482 (2003). In deciding whether there has been a misleading promise of reward or leniency, we view the totality of the circumstances and examine, first, the officer's statement and, second, the vulnerability of the defendant. *Id.*

If, during the first step, we decide that the officer's statements are unambiguous false promises of leniency, there is no need to proceed to the second step because the defendant's statement is clearly not voluntary. *Winston v. State,* 355 Ark. 11, 131 S.W.3d 333 (2003). If, however, the officer's statement is ambiguous, making it difficult for us to determine if it was truly a false promise of leniency, we must proceed to the second step of examining the vulnerability of the defendant. *Id.* Factors to be considered in determining vulnerability include: 1) the age, education, and intelligence of the accused; 2) how long it took to obtain the statement; 3) the defendant's experience, if any, with the criminal-justice system; and 4) the delay between *Miranda* warnings and the confession. *Id.*

Detective Gibbons testified that each time appellant was interviewed he was reminded of his *Miranda* rights. He said that, when appellant indicated he wanted a deal, he told appellant he would "help him as much as I can." He said that, when he informed McQuary that appellant wanted a deal, McQuary in-

formed appellant that he would not make any deals or promises and that he would only take into consideration any help appellant could provide in recovering the stolen property. Detective Gibbons recalled McQuary telling appellant that he would let the prosecutors in the other counties know that appellant was cooperating and that he would talk to the other prosecutors to "see if they could lump them all together." He said that McQuary was not specific in what he would do in exchange for appellant's cooperation. He stated that McQuary did lay out what appellant could be tried for and his possible sentence if found guilty.

Detective Robert Byrd of the Grant County Sheriff's Department testified that he came in contact with appellant on August 18 at the Saline County Criminal Investigation Division. He said that, prior to talking to appellant, he confirmed that appellant had been advised of his *Miranda* rights. He said that, during his talk with appellant, he informed appellant that he was a suspect in several burglaries in Grant County. He said that appellant indicated that he had knowledge about the burglaries but did not admit that he had any involvement in the burglaries. Detective Byrd testified that he did not employ threats or coercion to get appellant to talk. He said that he talked with appellant again on August 20. He said that, prior to having appellant identify the homes he had burglarized, he confirmed that appellant had been made aware of his *Miranda* rights. Detective Byrd denied making any promises of leniency in exchange for appellant's cooperation. He also denied employing any threats.

Ms. Beard testified that appellant was thirty years old, able to read and write, and able to make his own decisions. She recalled asking what would occur if appellant cooperated and that one of the detectives replied that appellant would get a better deal. She said that she asked McQuary to put something down on paper but that he refused and said that appellant would spend less time incarcerated.

Appellant testified that he understood that he did not have to talk to the police officers. He said that, during his meeting with McQuary, McQuary informed him how much time he could receive and said that, if appellant cooperated, he would receive less time. He also said that McQuary informed him that, if he cooperated with the surrounding counties, he could serve his time concurrently. Appellant testified that McQuary refused to put anything in writing, but he believed that they reached an agreement where, in exchange for appellant's cooperation, McQuary

would see that appellant served one sentence and that McQuary would talk to the prosecuting attorneys in Grant and Pulaski counties. He believed that an agreement between him and Saline County would also bind Grant County. Appellant did not remember Detective Byrd making any promises of leniency.

During his testimony, John McQuary stated the following:

> I think he was well aware of which avenues are available to defendants. Otherwise, he wouldn't have known to say, hey, I want a prosecutor down here, you know, right now because only defendants that have been through that before know that it's the prosecutor is [sic] the only one that can, you know, lay it on the line and it's held to. So yeah, I mean, [appellant] had spent most of his time in prison or I think he also had some juvenile as well. So he knows the judicial system and knows law enforcement.

McQuary further testified that, when he was notified that appellant wanted a deal, he informed the officers that "I don't make any kind of deals whatsoever on the front end." He said that he never indicated to appellant that he had the authority to bind any other district. He testified that he told appellant the following:

> I told him . . . that I knew Eddy Easley and I also knew Larry Jegley, and that if, in fact, he assisted all different [sic] law enforcement agencies that I would contact both Eddy Easley, Larry Jegley, and, at the time I was still working down in Saline [C]ounty, and that we would see if we could not wrap everything up for him before he went down to the pen so that once he went to the pen, because I told him, I said, you know you're going to the pen. And I said the best that we can do is try to wrap everything up in all three counties so that when you do go down there it's all behind you. Once you finish up you're done, you're out. But I couldn't make him any promises as to whether that would occur or not.

McQuary testified that he, in fact, contacted the prosecuting attorneys for Pulaski and Grant Counties.

Here, the statements made to appellant were rather ambiguous; therefore, we must consider whether appellant was particularly vulnerable. Appellant was thirty years old and had been in and out of the criminal-justice system for several years. Plus, each time appellant was questioned, he was reminded of his *Miranda* rights. Furthermore, it appears that appellant's sole pur-

pose in requesting McQuary's presence was so that he could cut a deal with the State. Under the totality of the circumstances, we cannot say that false promises of leniency were made to appellant. Accordingly, the trial court did not err when it denied his motion to suppress his statements made to law enforcement officers.

Affirmed.

PITTMAN, C.J., and GLADWIN, ROBBINS, BAKER, JJ., agree.

GRIFFEN, J., dissents.

WENDELL L. GRIFFEN, Judge, dissenting. Today, the majority announces that a prosecutor can either misstate or deceive an accused regarding whether the accused has the right to have counsel present during the custodial interrogation portion of a criminal prosecution and that doing so does not constitute prejudicial error. In affirming, the majority 1) endorses the State's misconduct and its effect of negating appellant's *Miranda* rights by misinforming him that he did not have the right to an attorney during the interrogation unless his mother paid for an attorney; and 2) punishes appellant, who did not request an attorney after being told by the prosecutor that he did *not* possess the right to an attorney at that point in the proceedings.

I agree with the majority that appellant's mother could not assert his right to an attorney. I defer to the trial court's credibility finding that appellant did not assert his right to an attorney. I also agree that appellant's confession was not swayed by false promises of leniency. However, the majority misapprehends the dispositive issue in this case as well as my reason for recommending reversal: regardless of who asked for an attorney, it is undisputed that appellant confessed only after Prosecutor Jack McQuary responded to the request by falsely informing appellant that he had no right to an attorney until he was charged, unless appellant's mother paid for the attorney.

Presumably because appellant failed to request an attorney, the majority wholly fails to analyze the effect of McQuary's misstatement. However, to affirm simply because appellant did not invoke his right to counsel ignores the governing law concerning such misstatements. The majority decision also begs the question of *whether appellant was misled to believe that he had no right to counsel and whether the prosecutorial misrepresentation affected his subsequent decision to provide incriminating evidence to the police.* The fact that appellant

believed he understood his *Miranda* rights but did not invoke his right to counsel does not mean, *ipso facto*, that any statement made during his custodial interrogation was necessarily the product of a free and deliberate choice. Thus, the fundamental issue is whether appellant's failure to invoke his right to an attorney was the result of intimidation, coercion, or deception by the State. The record clearly shows that it was; therefore, I would reverse.

The majority correctly cites the standard of review governing custodial statements, but fails to mention that in order to determine whether a waiver of *Miranda* rights is voluntary, knowing, and intelligent, the appellate court looks to see if the statement was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Miranda v. Arizona*, 384 U.S. 436 (1966); *Conner v. State*, 334 Ark. 457, 982 S.W.2d 655 (1998); *Sanford v. State*, 331 Ark. 334, 962 S.W.2d 335 (1998). In this case, an examination of the totality of the circumstances surrounding the giving of appellant's inculpatory statements requires an examination of appellant's rights pursuant to *Miranda*, his rights as stated in the rights form that he signed, and his rights as subsequently negated by the prosecutor's misstatements.

A defendant's Fifth Amendment right to an attorney prior to and during custodial interrogation has been succinctly explained by the United States Supreme Court in *Miranda* as follows:

> Accordingly we hold that an individual held for interrogation must be clearly informed that he has the *right to consult with a lawyer and to have the lawyer with him during interrogation* under the system for protecting the privilege we delineate today. As with the warnings of the right to remain silent and that anything stated can be used in evidence against him, *this warning is an absolute prerequisite to interrogation. No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead.*

384 U.S. at 471-72 (emphasis added).

The very purpose of the *Miranda* warnings is to inhibit misconduct by State authorities. *See id; Landrum v. State*, 326 Ark. 994, 936 S.W.2d 505 (1996). Further, the interest protected by the *Miranda* warnings is the suspect's "desire to deal with the police *only through counsel.*" *Edwards v. Arizona*, 451 U.S. 477, 484 (1981) (emphasis added). Thus, *Miranda* requires that "if police propose to interrogate a person they must make known to him that he is entitled to a lawyer and that if he cannot afford one, a lawyer will

be provided for him *prior to any interrogation." Miranda, supra* at 474 (emphasis added). Additionally, the Fifth Amendment privilege protected by *Miranda* comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present *during any questioning* if the defendant so desires. *Miranda, supra* at 470.

Even if appellant did not invoke his right to an attorney, that does not end the voluntariness inquiry because the question of voluntariness and the question of a knowing and intelligent waiver are separate inquiries. *See Wofford v. State*, 330 Ark. 8, 952 S.W.2d 646 (1997). Appellant's inculpatory statements in this case, made without benefit of counsel, were elicited in violation of his *Miranda* rights because they were the involuntary product of the prosecutor's false statement that appellant had no right to an attorney until he was charged, unless his mother paid for an attorney.

The majority does not and cannot dispute that appellant was entitled to an attorney. After all, appellant clearly was being custodially interrogated. *See Davis v. State*, 330 Ark. 76, 953 S.W.2d 559 (1997). He was taken into custody on a parole violation on August 17, 2004, and remained in custody when he confessed on August 20, 2004. Therefore, his Fifth Amendment right to an attorney under *Miranda* attached on August 17, when the custodial interrogation began.

The form that appellant signed in this case stated in relevant part:

> 3. Do you understand that you have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during the questioning?
>
> 4. Do you understand that if you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish, at no cost to you?
>
> 5. Do you understand that if you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time? You also have the right to stop answering at any time until you talk to a lawyer.

The words, "Yes, Sir" and appellant's initials appear after these questions. Thus, this form clearly informed appellant that he had the right to an attorney before and during the questioning regarding the burglaries.

Despite the majority's implication, there is no credibility issue regarding whether Prosecutor McQuary subsequently misinformed appellant regarding his right to an attorney during questioning. The prosecutor's misleading statement that followed appellant's signing of the rights form was not merely "alleged" and was not merely directed to the mother, as the majority asserts. Rather, it is undisputed that Detective Gibbons, who was present during the interview, testified that Prosecutor McQuary "said that if and when he [appellant] was charged with anything he would go to court and he could be appointed an attorney or she [his mother] could get him an attorney if she wanted an attorney. That if he wanted an attorney that everything would stop." It is also undisputed that both appellant and his mother were present and heard McQuary's misrepresentation of appellant's rights.

McQuary clearly misstated the law. His statement directly contradicted appellant's *Miranda* rights and the *Miranda* form signed by appellant. Essentially, McQuary told appellant *that he had no right to an attorney during the interrogation unless his mother paid for one. See Mayfield v. State*, 293 Ark. 216, 736 S.W.2d 12 (1987) (reversing because the *Miranda* warning provided to the defendant did not convey to the defendant that he could have a lawyer appointed free of charge); *Reed v. State*, 255 Ark. 63, 498 S.W.2d 877 (1973) (holding that *Miranda* warnings were inadequate where, although the written *Miranda* waiver informed the defendant that he had the right to an attorney before making any statement or answering any question, the police officer indicated to the defendant that if he did not have an attorney before he went to trial the court would appoint an attorney for him).

Nonetheless, it is true that a misstatement of fact by an officer, standing alone, does not invalidate a subsequent confession. *Pyles v. State*, 329 Ark. 73, 947 S.W.2d 754 (1997). For a statement to be involuntary, the confession must have been induced or influenced by the police officer's statements. *Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003). Here, after McQuary's misrepresentation, appellant decided to cooperate with Pulaski, Saline, and Grant County detectives. In particular, on August 20, appellant confessed to the two burglaries in Grant County that are the subject of this appeal. Appellant testified that but for McQuary's promise to speak to the other prosecutors, he (appellant) would have not spoken to the Grant County police officers.

Although ignored by the majority, the effect of McQuary's incorrect and misleading statement that appellant was not entitled to an attorney until he was charged with a crime was to undermine or negate appellant's understanding of his rights and thus, to negate the over-all effectiveness of the *Miranda* warnings. *See, e.g., contra, Tasby v. U.S.*, 451 F.2d 394 (8th Cir. 1971) (affirming *Miranda* warnings where the defendant was told that he would be appointed an attorney "at the proper time" because that statement did *not* negate the overall effectiveness of the *Miranda* warnings). Further, it is clear that McQuary's statement, made in appellant's presence and in response to an inquiry about an attorney, directly affected appellant's capacity to comprehend and knowingly relinquish his constitutional right "to deal with the police only through counsel." *See Edwards, supra* at 484. The majority must concede that appellant's initial understanding that he had a right to an attorney during questioning was subsequently vitiated when McQuary misinformed him to the contrary, his experience with the legal system notwithstanding.

Thus, it cannot be said that McQuary's statement did not induce appellant's decision to thereafter confess. McQuary made it clear to appellant that *despite what appellant believed his rights to be,* he had no right to an appointed attorney *until* he was charged. The majority does not explain how appellant can somehow be held to have freely relinquished a right that he was told he did not have. I do not understand how the majority can conclude that appellant's statements were made without coercion, deception, or intimidation when appellant was incorrectly told that he had no right to an attorney until he was charged, when appellant was told that if he cooperated (in other words, incriminated himself), McQuary would contact the other prosecutors to see if they could "wrap up" all of his charges at one time, and appellant shortly thereafter decided to cooperate with the police without benefit of an attorney during his custodial interrogation.

*Miranda* warnings may be sufficient where a defendant is correctly informed that an attorney will be appointed when he goes to court but the warnings do not otherwise negate the defendant's right to counsel *during interrogation. See Duckworth v. Eagan,* 492 U.S. 195 (1989); *Williams v. State,* 321 Ark. 344, 902 S.W.2d 767 (1995). However, the United States Supreme Court has recognized a difference in those cases in which the effect of the warnings is to link an accused's right to an appointed counsel to a point in time *following* the police interrogation. *See California v.*

*Prysock*, 453 U.S. 355 (1981). The *Prysock* court upheld *Miranda* warnings in which the accused was informed, prior to and during his interrogation, of his right to have an attorney present prior to and during interrogation at no cost if he could not afford an attorney.

However, in so holding, that Court found that "nothing in the warnings given [to the accused] suggested any limitation on the right to the presence of appointed counsel different from the clearly conveyed rights to a lawyer in general, including the right to a lawyer" before and during questioning. *Id.* at 361. In particular, the Court noted the contrast between *Prysock* and other cases in which "the reference to the right to appointed counsel was linked with some future point in time after the police interrogation." *Id.* at 360.

The *Prysock* rationale applies here because McQuary's comment effectively negated appellant's right to an attorney during interrogation and linked his right to an attorney to a time point following interrogation, unless his mother paid for an attorney. This case is similar to *Reed, supra,* in which the Arkansas Supreme Court held that *Miranda* warnings were inadequate where, although the written *Miranda* waiver informed the defendant that he had the right to an attorney before making any statement or answering any question, the police officer indicated to the defendant that if he did not have an attorney before he went to trial the court would appoint an attorney for him. The *Reed* court explained: "The officer's statement of Reed's rights was fatally defective in that it failed to inform Reed that he was entitled to the services of an appointed attorney *at the time of the interrogation." Id.* at 64 (emphasis added). *See also Moore v. State*, 251 Ark. 436, 472 S.W.2d 940, 442-43 (1971) (holding that *Miranda* warnings were insufficient as to an indigent defendant where the written form explaining *Miranda* rights stated that an attorney "will be appointed for you, if you wish, if and when you go to court"). The effect of the prosecutor's statement in the instant case similarly operated to misinform appellant that he had no right to an attorney during the interrogation unless his mother provided one.

Finally, while appellant generally confessed to committing some burglaries and requested a deal *before* McQuary misinformed him concerning his right to an attorney, appellant's initial request for a deal should not preclude a finding that his statement was involuntary based on McQuary's subsequent misrepresentation regarding his right to an attorney. By volunteering information or

asking for a deal, a defendant does not forever waive his right to an attorney or necessarily evince an intent to *accept* the bargain without an attorney. Moreover, appellant's general confession in no way duplicated the detailed, incriminating information that he gave the police following McQuary's misinformation and promise to contact the other prosecutors in exchange for appellant's cooperation. Thus, it cannot be said that the error in admitting the evidence was harmless because appellant's confessions were cumulative to any statements he made prior to McQuary's misrepresentation.

Because appellant's confession was induced by the prosecutor's misstatement concerning his right to an attorney, I would reverse the trial court's denial of appellant's motion to suppress. Unfortunately, I suspect that today's holding will do nothing to induce prosecutors to be accurate in their dealings with accused persons during custodial interrogations. If anything, the result announced today appears to signal that prosecutorial misrepresentations and deceptions concerning *Miranda* rights are judicially excused. Respectfully, I must dissent.